556 P.2d 814

Helen Green **TOVREA,** Edward A. Tovrea and Edward C. LeBeau, as Co-Trustees under the will of Philip E. Tovrea, Deceased, Appellants,

v.

Tovrea Garnett **UMPHRESS,** a widow, Jayme Garnett, an unmarried woman and Irene Garnett Armstrong, wife of Beltan Armstrong, dealing with her sole and separate property, Appellees.

**No. I CA-CIV 2956.**

Court of Appeals of Arizona,
Division 1,
Department A.

Sept. 21, 1976.

Rehearing Denied Oct. 22, 1976.

Petition for Review Denied Nov. 23, 1976.

**514**

Norman S. Hull, Tucson, Evans, Kitchel & Jenckes, P.C. by Ralph J. Lester, Phoenix, for appellants.

Moore & Romley by Elias M. Romley, Roger T. Hargrove, Phoenix, for appellees.

## OPINION

NELSON, Judge.

This is an appeal brought by the Co-Trustees under the will of Philip E. Tovrea. The action is one to quiet title to a tract of land in Phoenix, Arizona. Appellants, defendants below, filed a counterclaim and crossclaim for specific performance of a written option to purchase the land in question. Appellees are three of the four residuary legatees under Della Tovrea Stuart's will.

The essential issue in this case is the validity of the Option Agreement—the subject of appellant's counterclaim and crossclaim. On appeal it is argued that the trial court erred in holding that the Option Agreement executed by Della Tovrea and the Tovrea Packing Company, dated April 23, 1935, was invalid and of no force and effect. We agree and therefore reverse the judgment of the trial court.

In 1931 Della and Edward Tovrea acquired the subject property. The record below established that it was the community property of Edward and Della and was used as the family home until Edward's death in 1932. Della continued to occupy the property until her death in 1969. The property was adjacent to the stockyards and feeding lots of the Tovrea Packing Company, the family's business enterprise.

By virtue of her community property interest, Della was the owner of an undivided one-half interest in the property. The co-trustees under Edward's will, (Della being one), acquired the other undivided one-half interest by decree of distribution entered in 1933.

The trustees quitclaimed their undivided one-half interest to Della on April 23, 1935. On the same date, Della and the

Tovrea Packing Company executed an Option Agreement. In the quitclaim deed it was stated that the consideration consisted of $3,600 paid by Della Tovrea and "the terms, covenants and conditions of the Option Agreement."

In essence, the agreement provided that if Della desired to sell the subject property at any time during her life, she must first give the packing company the opportunity to purchase it for $3,600, together with interest on the $3,600 at the rate of six percent (6%) per annum, plus a sum equal to one-half of the then market value of the premises. The parties were to agree upon the market value, and if they could not, the market value was to be determined by three appraisers, whose decision would be final.

The material provisions of the Option Agreement are as follows:

"(1) If First Party [Della] shall desire to sell or dispose of said premises, or any interest therein, or part thereof, she shall before selling or disposing of or attempting to sell or dispose of said premises, or any interest therein, or part thereof, give written notice of such desire to First Party, and Second Party [Tovrea Packing Company] may within fourteen (14) days after the receipt of such notice, exercise its said option by depositing in the United States Post Office at Phoenix, postage prepaid, an envelope addressed to First Party at the address mentioned in her said notice, containing a written notice of Second Party's intention to exercise its said option, whereupon Second Party's right to complete the purchase of said premises, upon the terms hereinafter stated, shall become vested in Second Party. If, under the circumstances and within the time and manner aforesaid, Second Party shall fail so to exercise said option, the same shall thereupon wholly lapse and determine.

"(2) In the event First Party does not sell or dispose of said premises as aforesaid during her lifetime, and if Second Party's said option shall not theretofore have lapsed and determined, as provided in the foregoing paragraph (1) hereof, then Second Party, within one year after the death of First Party, may exercise its said option by giving written notice of its intention so to do to the executor or administrator of the estate of First Party.

"(3) The purchase price for said premises if and when said option shall be exercised by Second Party shall be in the sum of Three Thousand Six Hundred Dollars ($3,600), together with interest thereon at the rate of Six per cent (6%) per annum from the date this instrument bears until paid, together with a sum equal to one-half of the then market value of said premises. Said market value shall be then agreed upon between the parties hereto, provided, however, that if said parties cannot agree as to the then market value of said premises such value shall be determined by three appraisers. First Party and Second Party shall each thereupon appoint an appraiser who together shall appoint a third appraiser. The then market value as found and certified by said appraisers shall be final and conclusive upon the parties hereto, their and each of their respective heirs, executors, administrators, successors and assigns.

"(4) Within fourteen (14) days after said appraised value is so found by said appraisers and certified by them in writing to Second Party, or said value agreed upon as aforesaid, Second Party shall pay said aggregate purchase price so ascertained or determined to First Party or to the executor or administrator of her estate, and said Second Party or such executor or administrator thereupon, simultaneously with such payment, shall make, execute and deliver to Second Party a good and sufficient deed conveying and granting to Second Party all of the aforesaid particularly described premises, and said deed shall contain a covenant that First Party and/or the

grantor of said deed shall bind First Party and/or the grantor, and First Party's and/or the grantor's heirs, executors, administrators, successors and assigns, to warrant and forever defend as against all acts, deeds and/or encumbrances of First Party and/or the grantor, and no other, from the date this option agreement bears, all and singular the said premises unto the said Second Party herein, its successors and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof."

In 1958 the corporation assigned the Option Agreement to Philip E. Tovrea. He died in 1962. By decree of distribution the Option Agreement was distributed to the trustees under his will, appellants herein.

Della died on January 17, 1969. Her will directed that her property be sold, and the proceeds distributed among her residuary legatees. The residuary legatees are her sister, defendant Ima Gillespie Rutherford, (one-half interest), and her three nieces, plaintiffs Tovrea Garnett Umphress, Jayme Garnett, and Irene Garnett Armstrong (sharing the other one-half interest).

On December 26, 1969, the Trustees of Philip's will gave written notice of exercise of the option to Della's executor. This was received by the executor on December 30, 1969 within one year from Della Tovrea's death.

Plaintiffs filed this action to quiet title on March 8, 1972 after the defendants refused a request to execute a quitclaim deed. Defendants, as indicated supra, counterclaimed for specific performance of the option.

Appellant's initial contention on appeal is that under the Arizona statutes in force at the time of the creation of the option, the option was not an invalid restraint on alienation. The statute then in force is set forth in Revised Code 1928, § 2761:

"§ 2761. Rule against perpetuities. The absolute power of alienation shall not be suspended by any limitation or condition for a longer period than during the continuance of two lives in being at the creation of the estate and twenty-one years thereafter, except in the case mentioned in the next section, and except in a grant or devise to a charitable, literary or cemetery use. Every future estate shall be void in its creation which shall suspend the absolute power of alienation for a longer period. Such power of alienation is suspended when there are no persons in being by whom an absolute fee in possession can be conveyed."

Appellants urge that this statute was designed as a *substitute* for the common law on alienation restraints, but was improperly designated as a rule against perpetuities in its title. They claim that the statute wholly revised the common law on the subject of alienation restraints, until it was repealed in 1963. The law in Arizona in 1935, they contend, was that restraints on alienation were valid unless they were absolute and for a period exceeding two lives in being plus twenty-one years.

We cannot agree with the contention that Revised Code 1928, § 2761 abrogated or modified the common law rule on alienation restraints [1]. When Arizona's statute was adopted in 1913, it was patterned on the perpetuities statutes in force in Wisconsin and New York. The Arizona statutes have been characterized in this way: ". . . the Arizona statutes restate the rule against perpetuities as a rule against the absolute power of alienation." 6 American Law of Property, § 25.-58 at 305 (A. J. Casner ed. 1952). See also:

---

1. The terms "restraint on alienation" and "suspension of the power of alienation" are frequently confused. They are not synonymous. In Simes, Law of Future Interests (2d ed., 1966, p. 238), the following description appears: "The latter is a term found in the New York statute on perpetuities, and in the statutes of some other states modeled after the New York statute."

Powell, Perpetuities in Arizona, 1 Ariz.L. Rev. 225 (1959) [2].

Courts with similar statutes have favored an interpretation that the common law rule on alienation restraints was not replaced by statutes such as § 2761, supra. *McGinnis v. McGinnis,* 391 P.2d 927 (Wyo. 1964). In *Robertson v. Simmons, 322 S. W.2d 476* (Ky.App.1959), the court noted:

". . . that the common law rule against suspension of the power of alienation has existed in the common law of this state regardless of the troublesome statute." 322 S.W.2d at 483.

Thus the validity of alienation restraints is viewed not only from the statutory perspective but also in light of the common law requirements of reasonableness. See *Citizens Fidelity Bank and Trust Company v. United States,* 209 F.Supp. 254 (W.D. Ky.1962).

Restraints on alienation are generally disfavored. While some courts hold that restraints on alienation even for a limited time are void, other courts take the view that reasonable restraints are not offensive. In 73 C.J.S. Property § 13(b), pages 195–196, the writer states:

"* * * In many jurisdictions restraints on alienation are not invalid as against public policy if they are reasonable, although they will not be upheld unless they serve a legal and useful purpose, or unless positive law or public policy demands it.

"Where restraints are not ipso facto void, whether a substantial restraint on alienation is valid depends on the particular circumstances; and the public policy against restraints on alienation may be relaxed where the circumstances convince the court that it is a reasonable means of accomplishing a purpose recognized as proper * * *."

The Option Agreement in question contains two parts: (1) the preemption during Della's lifetime; (2) the option for one year after her death. Purchase price in either situation was to be computed in the same fashion. Appellees contend that the agreement creates a twofold restraint. The vice of the matter, they argue, is that in either case the property is to be sold for approximately one-half its value. The appellants urge that the provisions of the agreement are severable. We do not agree that the provisions are severable. Since the price determination is the basis of the alleged restraint on alienation, and is identical in each segment of the option, we will construe the agreement as a whole.

There is a well recognized legal distinction between options and preemptive rights. As stated in 6 American Law of Property, § 26.64, p. 507 (A. J. Casner ed. 1952):

"A pre-emption does not give to the preemptioner the power to compel an unwilling owner to sell; it merely requires the owner, when and if he decides to sell, to offer the property first to the person entitled to the pre-emption, at the stipulated price. Upon receiving such an offer, the pre-emptioner may elect whether he will buy. If he decides not to buy, then the owner of the property may sell to anyone."

See also: *Mercer v. Lemmens,* 230 Cal. App.2d 167, 40 Cal.Rptr. 803 (1964).

Despite this distinction, it is clear that options to purchase at a fixed price and preemptions at a fixed price have much the same effect on restraining the alienation of property. *Kamas State Bank v. Bourgeois,* 14 Utah 2d 188, 380 P.2d 931 (1963). It has been stated that: "As a practical impediment to alienation, the ordinary option is far more objectionable than many preemptions." 6 American Law of Property, § 26.66, p. 509. (A. J. Casner, ed. 1952). The rule against restraints on alienation is

2. When Revised Code 1928, § 2761 was repealed in 1963, A.R.S. § 33–261.01 (renumbered 33–261), Laws 1963, Ch. 25, Sec. 1 was enacted. It states:

"The common law rule known as the rule against perpetuities shall hereafter be applicable to all property . . . ."

applied to options reserved in deeds or in connection with such conveyances. *Trustees of the Casa View Assembly of God Church v. Williams*, 414 S.W.2d 697 (Tex. Civ.App.1967).

Three important factors are involved in determining the validity of a preemptive right with respect to restraints on alienation: (1) the purpose of the preemption; (2) its duration; and (3) the method of determining the price to be paid. *Missouri State Highway Commission v. Stone*, 311 S.W.2d 588 (Mo.App.1958); Annot. 40 ALR 3rd 920 § 4[a].

First, then, what object or purpose is the restraint to accomplish? There is no specific purpose stated within the four corners of the Option Agreement itself. As in the case of *Dodd v. Rotterman*, 330 Ill. 362, 161 N.E. 756 (1928), there is no direct evidence of the circumstances under which the deed and agreement were executed, or the motive which caused their execution. An examination of the surrounding facts and circumstances is thus warranted.

Della Tovrea Stuart was a tenant in common with the trustees and was not entitled to exclusive possession of all, or any part of the tract. The trustees could assert their right to occupy the property at any time. By way of the quitclaim deed and agreement, Della was insured the exclusive right of use and occupancy of her home property during her lifetime. The agreement insured that the property would not be partitioned during her lifetime. At the time the Option Agreement was signed in 1935, Della was a director of Tovrea Packing Company. Additionally, at the time of the signing, Della owned 10% or 11% of the outstanding stock of the packing company. She was also a co-trustee under Edward's will. Della was to be reimbursed for her entire investment and interest on her cash outlay in obtaining the trustees' one-half of the property. There is also a suggestion in the record that the option served a protective purpose for the packing company. The Option Agreement allowed the property to serve as a buffer zone that shielded the company from possible nuisance complaints and litigation. In addition to this, the packing company was able to obtain land for future expansion.

There is no contention that the Option Agreement is unreasonable in duration, thus we will not examine the agreement in those terms. Suffice it to say that the agreement was valid both by the common law rule against perpetuities and by the statutes in force at the time, the maximum length of the agreement being the length of Della's life plus one year.

The third question to be resolved is the method of determining the price to be paid. It is this issue that appellees argue constitutes an unreasonable restraint on alienation.

In *Kershner v. Hurlburt*, 277 S.W.2d 619 (Mo.1955), the court found that a substantial restraint on alienation was imposed where the contract provided for a stipulated price and no valid purpose or object would be served by the restraint in question. It was noted that whether a particular restraint is valid in substance depends on whether it is *reasonable under the circumstances*. The court specifically rejected the proposition that a fixed price per se invalidates a restraint.

A fixed price option was characterized as being a substantial restraint in *Missouri State Highway Commission v. Stone*, supra. The court explains its holding in this fashion:

"If the property increases in value the owner is not liable to sell, and if it decreases in value the buyer is not likely to take advantage of his pre-emption right. The practical effect of such restraint is shown by the evidence in this case." 311 S.W.2d at 590.

See also: 6 American Law of Property, § 26.67, p. 510 (A. J. Casner ed. 1952); *Beets v. Tyler*, 365 Mo. 895, 290 S.W.2d 76, 81 (1956); Annot. 40 ALR 3d 920 § 4[b]; Restatement of Property § 413 (1944); *Kowalsky v. Familia*, 71 Misc.2d 287, 336

N.Y.S.2d 37 (1972); *Ross v. Ponemon*, 109 N.J.Super. 363, 263 A.2d 195 (1970).

A fixed price option or preemptive option was not found to be an unreasonable restraint in *Kamas State Bank v. Bourgeois*, supra, and *Hall v. Crocker*, 192 Tenn. 506, 241 S.W.2d 548 (1951). Similarly in *Roemhild v. Jones*, 239 F.2d 492 (8th Cir. 1957) the court considered a fixed price repurchase option and determined that the parties should be allowed to develop evidence on the reasonableness of the restraint. The rule of reasonableness in testing alienation restraints has been adopted in Arizona. *Hanigan v. Wheeler*, 19 Ariz.App. 49, 504 P.2d 972 (1972).

Both parties have referred to Restatement of Property § 413 (1944):

"§ 413. PREEMPTIVE PROVISIONS.

"(1) A promissory restraint or forfeiture restraint on the alienation of a legal estate in land which is in the form of a provision that the owner of the estate shall not sell the same without first offering to a designated person the opportunity to meet, with reasonable expedition, any offer received, is valid, unless it violates the rule against perpetuities.

"(2) A promissory restraint or forfeiture restraint on the alienation of a legal estate in land which is in the form of a provision

(a) that the owner of the estate shall not sell the same without first offering to sell to some designated person, either at a fixed price, or at a percentage of the price offered by another person, or

(b) that the owner of the estate shall pay a certain percentage of the sale price to some designated person,

is valid if, and only if, the restraint is valid under the rules stated in §§ 406–411."

The rule is clear that if a fixed price preemptive option is involved, the inquiry must proceed to the validity of the restraint under the rules stated in §§ 406–411. It is our view that §§ 406–411 provide the proper frame for analyzing both the preemptive option during Della's lifetime and the option to purchase within one year of her death. The most important test is reasonableness under the circumstances, § 406(c). The reasonableness concept is explained in § 406 comment on Clauses (a), (b) and (c), at 2406:

"i. *Reasonableness.* Even though a restraint on alienation is a forfeiture or promissory restraint and is qualified so as to permit alienation to some though not all possible alienees, the restraint must still be found to be reasonable under all the circumstances. The following factors, when found to be present, tend to support the conclusion that the restraint is reasonable:

1. the one imposing the restraint has some interest in land which he is seeking to protect by the enforcement of the restraint;

2. the restraint is limited in duration;

3. the enforcement of the restraint accomplishes a worthwhile purpose;

4. the type of conveyances prohibited are ones not likely to be employed to any substantial degree by the one restrained;

5. the number of persons to whom alienation is prohibited is small (see Comments *j* and *k*);

6. the one upon whom the restraint is imposed is a charity.

"The following factors, when found to be present, tend to support the conclusion that the restraint is unreasonable:

1. the restraint is capricious;

2. the restraint is imposed for spite or malice;

3. the one imposing the restraint has no interest in land that is benefited by the enforcement of the restraint;

4. the restraint is unlimited in duration;

5. the number of persons to whom alienation is prohibited is large (see Comments *j* and *k*)."

In applying this additional test to both aspects of the Option Agreement, we are compelled to find that the terms of the agreement create a valid restraint on alienation. The grantor imposing the restraint had an interest in the land which he was seeking to protect by the enforcement of the restraint. The restraint was limited in duration, and enforcement of the restraint accomplishes a worthwhile purpose. None of the factors tending to support the conclusion that the restraint is unreasonable exist.

The appellees argue that the restraint on alienation is invalid on two additional grounds: lack of consideration and laches. It is contended that since the appellants argued only one ground for reversal in their opening brief, i. e., that the agreement was not an invalid restraint on alienation, they have abandoned any contention that a decision based on one of the other grounds is erroneous. It is not clear to us upon which ground the trial court based its judgment. Certainly it is possible to conclude, as did the appellants, that the judgment was limited to the validity of the Option Agreement as a restraint on alienation. In any event, both appellees and appellants have argued the additional issues of lack of consideration and laches in the briefs and at oral argument. In view of the adequate presentation of these issues to the court, we find no abandonment.

Appellees argue that Della Tovrea Stuart was equitably entitled to her deceased husband's interest in the subject property, thus the agreement was without consideration. Reliance is placed upon Revised Code 1928, § 3974, which provided for the setting apart of a homestead.

We agree with the appellants that appellees' position on this issue constitutes a collateral attack against the decree of distribution of the estate of Della's husband, Edward Tovrea. *Varnes v. White*, 40 Ariz. 427, 12 P.2d 870 (1932). Despite the fact that Della may have had a right to a probate homestead and that the probate court could or should have set one aside, the decree of distribution—rendered by a court with jurisdiction, and unchallenged in any way—is not now open to attack in a collateral proceeding. The court in *Varnes* faced a similar challenge:

"If, therefore, the case were before us on an appeal by Lewis Varnes from an order of the probate court refusing to set aside a homestead, we would unquestionably hold that it was the imperative duty of the court to set it aside, either on request of the interested parties or of its own motion. But it does not necessarily follow that the court was without jurisdiction to make the decree of distribution in question." 40 Ariz. at 434, 12 P.2d at 872.

\* \* \* \* \* \*

" . . . It is doubtless true as a matter of law the probate court should have set aside a homestead for him if none had already been selected, but it is equally true that the court had jurisdiction to make a decree of distribution of an estate which was properly in its charge, even though such distribution was not made in the manner provided by law. A judgment cannot be collaterally impeached because it was based on a mistake of law, any more than if based on a state of facts." 40 Ariz. at 435, 12 P.2d at 872.

In *Varnes* the court cited cases characterizing the homestead right in the surviving spouse as a *right* to have the probate court set apart the property, rather than an estate in law or in equity. Thus action on the part of the probate court is required. We cannot agree with appellees that the consideration for the agreement was vitiated by the fact that the trustees were already under a duty to perform. Appellees have cited *In re Moore's Estate*, 67 Ariz. 65, 190 P.2d 914 (1948) to support the position that Della's right to have a homestead set aside was absolute. That case is

not in point since it involved a direct attack on a decree of the probate court.

The Option Agreement itself stated the consideration which supported it: the simultaneous execution of the quitclaim deed and the payment of the $3,600 in cash. The consideration here was clearly sufficient. *Dodd v. Rotterman,* supra; *Mercer v. Lemmens,* 230 Cal.App.2d 167, 40 Cal. Rptr. 803 (1964).

The final question for review is appellees' claim that the appellant trustees were guilty of laches in the exercising of the Option Agreement. They cite *Meyer v. Warner,* 104 Ariz. 44, 448 P.2d 394 (1968). That case is not pertinent to the facts here. There the claim of laches was directed to plaintiff's lack of diligence in notifying the lessors of their desire to purchase the property in question. In the instant case, notice of exercising the option was given within the specific time prescribed by the Option Agreement.

The defense of laches consists of two essential elements: (1) unreasonable delay, and (2) disadvantage or prejudice to the party asserting the defense. An element of this disadvantage is a change of position in good faith as a result of the delay. *Meyer v. Warner,* supra; *McFadden v. Wilder,* 6 Ariz.App. 60, 429 P.2d 694 (1967). See also: *Foster v. Bullard,* 496 S.W.2d 724 (Tex.Civ.App.1973).

Facts and circumstances surrounding each case will determine whether a claim is to be barred by laches. The lapse of time alone is not controlling. *Weller v. Weller,* 14 Ariz.App. 42, 480 P. 2d 379 (1971). Similarly the mere increase in the value of property will not defeat the right to a decree of specific performance. *Walton v. McKinney,* 11 Ariz. 385, 94 P. 1122 (1908); *Mercer v. Lemmens,* supra.

The record before us indicates that the appellants engaged in various efforts to implement the agreement subsequent to the time that they gave notice of a desire to exercise the option. Appellees emphasize the fact that appellants took no legal action

to clarify the option situation. To support this they state that the Executor of Della's estate urged the Trustees to petition the Probate Court for an order to perform the Option Agreement. The appellant Trustees did not proceed in this fashion, as they thought it would be an inappropriate way to settle the question of the option, and were attempting to settle the matter without litigation, if possible.

On February 23, 1972, the Executor under Della's will petitioned the Probate Court for an order to perform the Option Agreement. Appellant Trustees filed a concurrence in that proceeding on March 8, 1972. Appellees' lawsuit was filed on March 8, 1972. On March 14, 1972, an order was entered allowing the Executor of Della's estate to withdraw its petition for an order to perform the contract.

Co-Trustee Edward C. LeBeau testified that he saw no compelling reason to institute court proceedings. The Trustees were actively engaged in attempts to exercise the option. Efforts were made to secure the appointment of appraisers as required by the option. On May 6, 1971, the Trustees sent a letter to Della's Executor indicating a willingness to convene the appraisal board and naming one appraiser. On June 8, 1971, the Executor notified the Trustees that, contrary to a previous understanding, appellees did not consider the option as a legal contract.

While it is true that the testimony of Co-Trustee Edward C. LeBeau indicates that the Trustees did not initiate legal proceedings for various reasons that would be in their best interest, there is no evidence that the Trustees' actions were a result of speculation or other such activity that would prejudice the appellees. See *Walton v. McKinney,* supra.

When there is delay either due to the conduct of other parties or to bona fide attempts to avoid litigation, the defense of laches will not exist. 81 C.J.S. Specific Performance § 117, p. 656; *Consolidated Juchem Ditch & Reservoir Co. v. Old,* 62 Colo. 470, 163 P. 78 (1917). The delay here does not indicate an "abandon-

ment" of the claim, nor does it prejudice the defense of the opposing parties. The appellant-trustees has no intention to abandon their case or efforts to obtain specific performance. Reasons for the delay, as reflected in the record, were legitimately connected to business concerns, an attempt to protect trust assets for future beneficiaries, and a good faith effort to implement the option through negotiation or settlement, rather than litigation. It does not appear that the delay injured the appellees in their substantial rights. *Barr v. Petzhold*, 77 Ariz. 399, 273 P.2d 161 (1954). *McFadden v. Wilder,* supra.

The Option Agreement is neither invalid nor unenforceable. The judgment of the trial court is reversed and the cause is remanded with directions to enter a judgment for specific performance of the option here in question, together with such additional relief as may be indicated by the agreement and this opinion.

DONOFRIO, P. J., and OGG, J., concurring.