The CARVEL COMPANY, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 76–1490.

United States Court of Appeals,
First Circuit.

Argued May 3, 1977.

Decided Sept. 1, 1977.

Leonard Kopelman, Boston, Mass., for petitioner.

Joseph Norelli, Atty., Washington, D. C., with whom John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Robert Sewell, Atty., Washington, D. C., were on brief for respondent.

Before COFFIN, Chief Judge, CAMPBELL, Circuit Judge, and DOOLING, District Judge.*

DOOLING, District Judge.

The Carvel Company petitions to set aside an order of the National Labor Relations Board which required Carvel forthwith to sign and implement the 1975–1977 contract negotiated between Local No. 321 of the Plumbers, Steamfitters and Metal Trades, AFL–CIO, and the Pipefitting Contractors Association, Inc., of Maine, and the Board cross-petitions for enforcement of the order. The Board based its order on its finding that Carvel's withdrawal from the multiemployer bargaining that emanated in the contract took place only after negotiations had commenced, that the withdrawal was therefore untimely, and that, in consequence, Carvel's refusal to adopt the contract reached between the Pipefitting Contractors Association and Local No. 321 was an unfair labor practice under Section 8(a)(5) and (1) of the National Labor Relations Act, as amended, 29 U.S.C. § 158(a)(5) and (1). Carvel contends that negotiations did not in fact commence until over a month after it submitted its resignation from the Pipefitting Contractors Association, that the Board misinterpreted and misapplied the rule limiting the employer's power to withdraw from multiemployer bargaining, and that, even if its withdrawal was untimely, a later impasse in the multiemployer bargaining, and the Local's condonation of the withdrawal, relieved Carvel of the consequences of its untimely withdrawal. The appeal would test the boundaries of the Board's "*Retail Associates* doctrine" (1958 120 NLRB 388).

Petitioner Carvel had for many years been a member of the Pipefitting Contractors Association, and that Association had for about twenty years negotiated contracts for its membership with Local 321. The two year contract between the Association (representing Carvel among other member firms) and Local 321 covering the 1973–1975 period provided—

* Of the Eastern District of New York, sitting by designation.

"THIS AGREEMENT . . . is to continue through the period from May 1, 1973 to April 30, 1975. If either party desires a change in this agreement after April 30, 1975 they shall notify the other party on or before Feb. 1, 1975 and both parties shall meet within fifteen days to discuss same.

"If no such notice is given, the Agreement shall remain in effect until April 30, 1976 and shall remain in effect on a year to year basis thereafter until such notification is made."

The contract provided that Local 321 was recognized as the sole and exclusive agency and representative of the employees covered by the contract for collective bargaining purposes, and that the Association was recognized as the sole and exclusive bargaining agent for all "Employers of the members of Local No. 321."

The business manager of Local 321 telephoned the president of the Association before February 1, 1975, and inquired (for he had not handled earlier negotiations) about the normal procedure for initiating negotiations. Informed that it was done by letter, Local 321 on February 11, 1975, sent a letter to the Association advising that the Local had voted to reopen contract negotiations, and tentatively proposing a wage increase of $1.65 an hour and other changes in contract terms. The letter continued:

"In a conversation with Earle Reed [the president of the Association], we agreed that in lieu of a called meeting at this time, it would suffice primarily to set forth in a letter, the desired changes in the contract . . . .

"We are ready at any time to sit down with you and discuss the issues as presented."

It appears that before February 1st the Local's business manager had filed "the appropriate papers with the Federal mediation and State mediation Boards." The Association answered the Local's letter on February 14, 1975, saying,

"This acknowledges receipt of your letter dated February 11, 1975, which listed your tentative proposals for changes in the present contract . . . .

"This also confirms our understanding that this exchange of letters serves as the initial negotiation which the contract requires to take place prior to February 15th.

"Your tentative proposals will be presented to our Committee, and we will contact you in order to set a firm date for the next meeting for bargaining purposes."

On February 27, 1975, Carvel wrote the president of the Association stating that

"With much regret, I am submitting my resignation from the Pipe Fitting Contractors Association . . . .

". . . This decision is not the result of any pressure from either fellow contractors or any of the Locals, but rather a decision of my own choosing."

On March 5th the Association acknowledged receipt of Carvel's letter

". . . containing your resignation from this Association, which is hereby accepted with regret.

"Following a regularly scheduled meeting to be held on March 7th, the Association will furnish the three Maine U.A. Locals with a current listing of Association members, as required by our labor contracts with the Locals. As a result of your resignation your name will not appear on this listing, and you will not be represented by the Association in future bargaining with these three Locals."

The Association sent the current membership roster of the Association, dated March 5, 1975, to Local 321 on March 10, 1975; Carvel was not listed as a member. Shortly after receiving the list the Local's business manager asked Carvel's president why Carvel's name was not listed, and he was told that Carvel was no longer affiliated with the Association but that Carvel would pay the wages, fringes and so forth, but would not sign a contract with the Union.

The first face-to-face meeting between the Association and Local 321 took place on April 9, 1975. (Asked whether "the first negotiating meeting between the parties

was held on April 9, 1975" the Local's business manager incautiously answered, "Yes.") The evidence was that the Local deferred the meeting until the pressure of "a lot more plumbing work" could be brought to bear on the employers. At the first meeting the Union insisted on a one year contract and the Association on a two year contract. When this had been brought out, the examination of the business agent, by Carvel's counsel, continued,

"Q There was an impasse, wasn't there?

A Yes."

Three sessions were held in April without reaching any agreement, and on May 6th the membership of Local 321 turned down the Association's offer and voted to strike. The strike continued until May 31st, when the membership of Local 321 ratified a new contract for the two year period May 1, 1975, to April 30, 1977. That contract followed two further negotiation sessions during May. During the strike period the Local's business manager asked Carvel to sign such a letter-of-intent as non-members of the Association sign to give assurance that they will conform to the multiemployer contract retroactively to its effective date. Carvel declined to sign such a letter. Efforts were made after the strike to reach some agreement with Carvel but the evidence, far from clear, does not indicate that Carvel sought or took advantage of any tendered opportunity to arrive at an individual contract with Local 321.

The unfair labor practice charge was filed on June 23, 1975, amended August 7, 1975, went to hearing in December 1975, and on April 21, 1976, the Administrative Law Judge recommended dismissal of the complaint on the ground that, despite the dictum in *Retail Associates* that withdrawal of an employer or a union from a duly established multiemployer bargaining unit was not permissible (138 NLRB at 395)

". . . except upon adequate written notice given prior to the date set by the contract for modification, or to the agreed-upon date to begin the multiemployer negotiations",

no later Board decision had held untimely a withdrawal before the start of actual bargaining negotiations. The Board rejected the Administrative Law Judge's recommendation. The Board did not rely on the dictum in *Retail Associates*. Rather it stated the rule in this language:

"An employer may withdraw without the union's consent prior to the start of bargaining by giving unequivocal notice of the intent to abandon the multiemployer unit and to pursue negotiations on an individual employer basis. However, once negotiations have actually begun, withdrawal can only be effectuated on the basis of 'mutual consent' or 'unusual circumstances.' "

It found on the evidence that "negotiations" within the meaning of the *Retail Associates* rule commenced at latest on February 14th. In rejecting the Administrative Law Judge's reading of the facts, the Board, after summarizing the facts through the date of the Association's February 14th acknowledgement "that the process of reopening the contract had begun," said,

"Under these circumstances, to hold . . . that Carvel's subsequent withdrawal was timely, even though it occurred after the disclosure to the Association of the Union's bargaining demands, would be contrary to the *Retail Associates* rule of 'fostering and maintaining stability in bargaining relationship.'[5] For, an employer would thus be permitted to withdraw 'in the hope of obtaining, through separate negotiations, more favorable contract terms than those which are foreshadowed' by the Union's proposals.[6] The rule, however, is designed precisely to prevent such a 'disruption of the multiemployer group *via* a race for bargaining leverage.'[7] " [The citations are to *Retail Associates,* 120 NLRB at 393 and to *Mor Paskesz,* 1968, 171 NLRB 116, 118, enf'd., 2d Cir. 1969, 405 F.2d 1201.]

*Retail Associates* arose out of a union's use after months of negotiation of the tactic of picketing one of three employers in a multiemployer unit as a means of inducing all three employers to agree to a con-

tract and the union's later attempt to withdraw from multiemployer bargaining without the employers' consent. The Board's decision did not enunciate a new principle but it did elaborate its expression. It invoked the decision in *NLRB v. Truck Drivers Local Union No. 449* ("*Buffalo Linen*") 1957, 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676, as establishing the employer's right, under certain circumstances to preserve the integrity of association bargaining. *Buffalo Linen* was a case in which the members of an association locked out their employees when the union struck and picketed the plant of one employer in furtherance of effort to bring the multiemployer bargaining to a conclusion. The Court reversed a holding that the lockout was an unfair labor practice, reinstating the Board's holding that the lockout was defensive and privileged rather than retaliatory and unlawful. The Court emphasized by reference to the legislative history that the Congress intended the Board to continue its established administrative practice of certifying multiemployer units and to leave to the Board's specialized judgment the inevitable questions concerning multiemployer bargaining that were bound to arise. Noting the tension between employees' right to strike and employers' interest in measures of self-help, the Court said (353 U.S. at 96–97, 77 S.Ct. at 648):

> "Conflict may arise, for example, between the right to strike and the interest of small employers in preserving multiemployer bargaining as a means of bargaining on an equal basis with a large union and avoiding the competitive disadvantages resulting from nonuniform contractual terms. The ultimate problem is the balancing of the conflicting legitimate interests. The function of striking that balance to effectuate national labor policy is often a difficult and delicate responsibility which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review.
>
> "The Court of Appeals recognized that the National Labor Relations Board has legitimately balanced conflicting interests by permitting lockouts where economic hardship was shown. The court erred, however, in too narrowly confining the exercise of Board discretion to the cases of economic hardship."

While general enforceability was not directly in issue, the Supreme Court in *NLRB v. Strong,* 1969, 393 U.S. 357, 359, 89 S.Ct. 541, 543, 21 L.Ed.2d 546, when passing on the power of the Board to order an employer to pay fringe benefits agreed to in the multiemployer contract as well as back pay, observed that it was not disputed that the employer "withdrew from the . . . Association too late to escape the binding force of the agreement it had negotiated for him, supplanting previous agreements which had been negotiated in the same way", nor was it disputed that the employer's failure to sign the agreement was an unfair labor practice. Board orders relieving against plainly belated attempts to withdraw from multiemployer units during or at the close of negotiations are numerous. See, *e. g., NLRB v. Sheridan Creations, Inc.,* 2d Cir. 1966, 357 F.2d 245; *Universal Insulation Corp. v. NLRB,* 6th Cir. 1966, 361 F.2d 406; *NLRB v. Tulsa Metal Works, Inc.,* 10th Cir. 1966, 367 F.2d 55; *NLRB v. Spun-Jee Corp.,* 2d Cir. 1967, 385 F.2d 379, 382; *NLRB v. John J. Corbett Press, Inc.,* 2d Cir. 1968, 401 F.2d 673; *NLRB v. Paskesz,* 2d Cir. 1969, 405 F.2d 1201; *NLRB v. Johnson Sheet Metal, Inc.,* 10th Cir. 1971, 442 F.2d 1056. *Retail Associates* treats the principle as one applying both to the union and to each employer in the multiemployer unit. Each employer and the union are alike free to withdraw from multiemployer bargaining by giving timely and unequivocal notice of intention to do so. See, *e. g., Detroit Newspaper Publishers Assn v. NLRB,* 6th Cir. 1967, 372 F.2d 569; *Publishers Assn of New York City v. NLRB,* 2d Cir. 1966, 364 F.2d 293. But, in the absence of unusual circumstances, the beginning of the negotiation ends the right to withdraw.

█ The application of the *Retail Associates* rule over the last two decades has given it sufficient precision of formulation

to leave action under it unembarrassed by uncertainty and misgivings about possibly vagarious administrative applications. No more is necessary to operate safely in its domain of operation than advertence to the notice dates in the current bargaining agreement. Freedom of action is uncontrolled so long as it is unequivocal and timely. The *Retail Associates* rule is, none the less, an administrative construct intended to serve policy aims, stability in industrial relations and fairness in negotiation. As the cases insist, multiemployer bargaining rests on the reality of the consent of the union and of each employer, but the *Retail Associates* rule as formulated and applied makes clear that it is the real consent given at the outset that is meant, and once given at the outset of the negotiations, it cannot be withdrawn except in unusual circumstances. That is not familiar contract law but is a legitimate administrative rule in implementation of Section 8(a)(1), (5) and (b)(3) in the context of multiemployer bargaining.

■ It is true, as Carvel argues, that no reported decision appears to have placed the beginning point of negotiation at so early a point. But it is not possible to say that the evidence does not support the decision that the parties had opened their negotiations. The contract was reopened for negotiation as required by the terms of the 1973–1975 contract. Local 321 stated its position with completeness, and, while it prudently characterized its proposals as "tentative proposals presented for negotiation," the Association undertook to present them to its Committee. No more could, expectably, be accomplished by a first meeting, and the parties agreed that their letters would serve as the initial negotiation required by the contract. Carvel, acting through the Association, was a party to the letter exchange and to that agreement on its significance. If Carvel would have had it otherwise, it had only to notify the Association and Local 321 before the contract date, for when those dates came and Local 321 and the Association acted, contract negotiations were under way. So, certainly, the Board was free to find, for with it lay the task of defining,

within reason, what should mark the beginning of negotiations for purposes of applying the *Retail Associates* rule.

The challenging critique of *NLRB v. Sheridan Creations, Inc., supra,* in *NLRB v. Field & Sons, Inc.,* 1st Cir. 1972, 462 F.2d 748, 749–750, was not necessary to the decision. Field attempted to withdraw from the multiemployer unit after his only unionized employees quit his employ and left the area; the Board argued for compelling Field to sign the multiemployer agreement regardless of the reason for the refusal to sign and regardless of good faith and lack of adverse effect upon the bargaining process. The court suggested that an employer should be free to withdraw so long as no commitments have been made "at least absent some showing of detriment or bad faith." The court noted as a singular comparison that the Board had ruled that a union member, though contract bound to his union, may withdraw from the union with impunity during a strike even though he voted for the strike. But the Supreme Court, while holding that supervening strike hardships authorize the member to resign if there are no express limitations on members' rights to resign, has left open the question of the extent to which the contractual relationship of union to member may curtail the freedom to resign. *NLRB v. Granite State Joint Board,* 1972, 409 U.S. 213, 217–218, 93 S.Ct. 385, 34 L.Ed.2d 422. Congress has, moreover, entrusted to the Board's expertise, at least "subject to limited judicial review", formulation of rules in this area. *See Buffalo Linen, supra,* 353 U.S. at 96. This rule is an "essential ingredient of [the Board's] efforts to achieve peaceful labor relations." *NLRB v. Beck Engraving Co., Inc.,* 522 F.2d 475, 480 (3d Cir. 1975). Certainly as applied to Carvel in this case, the Board's rule is not an abuse of its discretion. Carvel has not brought forward any justification for its action.

Carvel argues that bargaining had reached an impasse that justified its withdrawal. *Fairmount Foods Co. v. NLRB,* 8th Cir. 1972, 471 F.2d 1170, 1172–1173; *NLRB v. Beck Engraving Co., Inc., supra.*

Carvel's attempted withdrawal, however, was not occasioned by any condition of impasse, and, moreover, there is no evidence to support the assertion. The business manager's assent to the idea that there was an "impasse" referred only to the fact that at the first of three April bargaining sessions the parties had not agreed on the duration of the new contract.

The Board found the facts against Carvel's contention that Local 321 consented to Carvel's withdrawal and negotiated with it on an individual basis. The evidence amply supports the Board's findings in these respects. The evidence supports only the conclusion that Local 321 preserved contact with Carvel and probed for Carvel's ultimate purpose and intention.

It is argued that the Association and Local 321 did not follow the strict language of the 1973–1975 contract in reopening the contract and substituting the letter exchange for a face to face meeting. The contention is not available. The Association acted for Carvel, certainly until February 27th or March 5th. The Association's agreement to reopen the contract and to substitute the exchange of letters for a face to face meeting was action taken in Carvel's behalf. The convenient informality with which the Association and Local 321 proceeded through the first stage of negotiation disappointed no fair expectation of Carvel, and it adhered to the substance of the contract clause.

Petition for review denied.

Cross petition for enforcement granted.