712 P.2d 936

**ARIZONA LABORERS, TEAMSTERS AND CEMENT MASONS LOCAL 395 HEALTH AND WELFARE TRUST FUND, a Trust; Arizona Laborers, Teamsters and Cement Masons Local 395 Pension Trust Fund, a Trust; Laborers and Cement Masons Local 395 Savings Fund, a Trust; and Laborers Joint Training Fund, a Trust, Plaintiffs-Appellants, Cross Appellees,**

v.

**H. James HANLIN, dba Jim Hanlin Contracting Company; H. James Hanlin and Audrey E. Hanlin, husband and wife; Fidelity & Deposit Company of Maryland; and Surety Insurance Company of California, Defendants-Appellees, Cross Appellants.**

No. 1 CA–CIV 6929.

Court of Appeals of Arizona, Division 1, Department D.

July 18, 1985.

Motion for Reconsideration Denied Sept. 9, 1985.

J.T. Rich, Jr., P.C. by Joseph T. Rich, Jr. and Ward & Keenan, Ltd. by Gerald Barrett and Janet Smith Hepner, Phoenix, for plaintiffs-appellants, cross appellees.

Jennings, Kepner & Haug by Donald W. Hart and D. Kim Lough, Phoenix, for defendants-appellees, cross appellants Hanlin and Fidelity & Deposit Co.

Hill, Savoy & Ensign by Curtis D. Ensign, Phoenix, for defendant-appellee, cross appellant Surety Ins. Co.

## OPINION

HAIRE, Judge.

This appeal is taken from judgment after trial to the court in favor of the defendant, H. James Hanlin, doing business as Jim Hanlin Contracting Company (Hanlin). Hanlin, a contractor, executed a Memorandum Agreement by which he agreed to be bound by the Arizona Master Labor Agreement. The Master Labor Agreement is an industry-wide collective bargaining agreement negotiated between several unions performing construction work and a multi-employer bargaining unit composed both of formal associations representing groups of contractors and several independent contractors. Hanlin was one of these "independent" contractors.

This action was brought by representatives of union trust funds,[1] alleging that Hanlin had failed to make contributions to the funds as required by the Master Labor Agreement. The trust funds also named as defendants two sureties which had issued license bonds to Hanlin: Fidelity & Deposit Company of Maryland and Surety Insurance Company of California.

Hanlin responded that he had withdrawn from the multi-employer bargaining unit and was thus no longer bound by the Master Labor Agreement and counterclaimed for the refund of contributions he had mistakenly made to the funds after his withdrawal allegedly became effective on May 31, 1976. The trial court ruled in favor of Hanlin on both the complaint and counterclaim and awarded attorney's fees under A.R.S. § 12–341.01. We affirm the judgment on the complaint in part and reverse in part, affirm judgment in favor of defend-

ant on the counterclaim, and reverse the award of attorney's fees.

In recent history the Arizona Master Labor Agreement has been renegotiated every three years. Hanlin, executing the Memorandum Agreement on February 25, 1975, agreed to "be bound by all the terms of that certain collective bargaining agreement effective June 1, 1973 ... including, if any, all amendments, extensions, and renewals thereof...." The agreement specifically recognized that "negotiations between some or all of said unions and some or all of said [employer] associations will commence prior to the termination of said Association Agreement for the purpose of negotiating a successor agreement...." It also provided for withdrawal from the multi-employer bargaining unit, prior to negotiation of subsequent agreements:

"[The] undersigned employer shall comply with and be bound by all the terms of such successor agreement ... without regard to whether the undersigned employer does or does not participate directly or indirectly in said negotiations, unless prior to the commencement of such negotiations the undersigned employer gives actual and timely notice in writing to the unions that it is withdrawing from the multi-employer bargaining unit...."

The Master Labor Agreement itself was to remain in effect from June 1, 1973 through May 31, 1976. its termination clause provided that "[e]ither party desiring to terminate the agreement *or to change its terms* shall notify the other, in writing, not less than sixty (60) days prior to May 31, 1976." (Emphasis added).

The unions apparently sent the required notice of desire to renegotiate the collective bargaining agreement to some of the parties in March 1976. A trustee for the trust funds who was also a business manager for one of the signatory unions testified at trial that it was the union's practice to send

1. Laborers, Teamsters & Cement Masons Local 395 Health & Welfare Trust Fund, Pension Trust Fund, Savings Fund and Laborers Joint Training Fund.

formal notice by either registered or certified mail to all contractors' associations and separately to all contractors who signed individually. He admitted that the notice should have been sent to Hanlin but was unsure whether the union had receipts from the mailing. Hanlin testified that he neither received the notice nor otherwise discovered that negotiations would commence on March 24, 1976. On April 19, 1976, Hanlin mailed notice of his intent to withdraw from the multi-employer bargaining unit to each of the unions signatory to the Master Labor Agreement, completely unaware that negotiations had already commenced between the unions and the contractors' association. He received no response whatsoever from any of the unions and considered the agreement terminated as of May 31, 1976. His office continued to send payments to the trust funds for the next four months, ostensibly because of an administrative oversight. Even the termination of payments, however, did not produce any response for nearly one and one-half years, until the summer of 1978, when the trust funds requested an audit of Hanlin's records. They then filed this action in October 1978 to enforce the collective bargaining agreement under § 301 of the National Labor Relations Act.

The trial court found that the union had an implied obligation to notify independent contractors, including Hanlin, of their desire to renegotiate the collective bargaining agreement. It found that Hanlin never received notice of the negotiations, and concluded that his attempt to withdraw from the multi-employer bargaining unit after bargaining was underway was excused by these unusual circumstances. The court went on to hold that the trust funds' claims were barred either by equitable estoppel or by laches and that Hanlin was entitled to a refund of excess amounts mistakenly contributed to the funds and to attorney's fees.

The trust funds' primary argument on appeal is that the trial court erred in ruling that Hanlin's withdrawal from the multi-employer bargaining unit was effective. They assert that withdrawal from the multi-employer bargaining unit after negotiations have commenced is permitted only with the consent of the union or in unusual circumstances which are limited by case law. They also contend that even if the category of unusual circumstances can be expanded, that the union was not required to notify Hanlin of the commencement of negotiations and thus that lack of notice cannot be an unusual circumstance justifying an untimely notice of withdrawal. Hanlin raises several arguments in response. First, he contends that his participation in the Master Labor Agreement was in the nature of a § 8(f) pre-hire agreement and therefore that the agreement was voidable at will regardless of the law relating to multi-employer bargaining units.[2] We decline to address this issue because the argument is raised for the first time on appeal.[3] Hanlin also contends that the trust funds did not meet their burden of proving his unequivocal intent to be bound by multi-employer bargaining. We find the

---

2. In response to the unique needs of the construction industry, § 8(f) of the National Labor Relations Act, 29 U.S.C. § 158(f), allows construction industry unions and employers to enter agreements establishing terms and conditions of employment without the union's majority status having first been established under § 9 of the Act. In order to insure protection of the employees' § 7 right to select their own bargaining representatives, these "pre-hire agreements" have been held strictly voluntary and voidable by either party at any time until and unless the union attains majority support. *See Jim McNeff, Inc. v. Todd,* 461 U.S. 260, 103 S.Ct. 1753, 75 L.Ed.2d 830 (1983).

3. Hanlin correctly points out that this court may decide issues not raised to the trial court where the record shows affirmative facts to exist which are dispositive of the action. *Rubens v. Costello,* 75 Ariz. 5, 251 P.2d 306 (1952); *International Life Ins. Co. v. Sorteberg,* 70 Ariz. 92, 216 P.2d 702 (1950). Although there are implications in this record that the union did not represent the majority of Hanlin's employees, the question of union membership was not relevant to the issues tried to the court and was not directly addressed by either party. The issue is one of fact which we simply cannot determine without evidence.

requisite intent expressed clearly in the Memorandum Agreement and Master Labor Agreement executed by Hanlin and agree with the trial court's conclusion that Hanlin was a member of the multi-employer bargaining unit. The case cited by Hanlin to support his position, *Ruan Transport Corp.*, 234 N.L.R.B. 241 (1978), is distinguishable in that it lacked explicit contract terms binding the employers to successor agreements. Finally, Hanlin supports the trial court's determination that his withdrawal was effective.

It is clear, as the trust funds argue and as the trial court concluded, that federal common law governs this case. *Local 174, Teamsters, Chauffeurs, Warehousemen & Helpers of America v. Lucas Flour Co.*, 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962). There is also some limited room for analysis under principles of state law.

"Federal interpretation of the federal law will govern, not state law ... [b]ut state law, if compatible with the purpose of § 301, may be resorted to in order to find the rule that will best effectuate the federal policy.... Any state law applied, however, will be absorbed as federal law and will not be an independent source of private rights." *Textile Workers Union v. Lincoln Mills of Alabama*, 353 U.S. 448, 457, 77 S.Ct. 912, 918, 1 L.Ed.2d 972, 981 (1957) (citations omitted).

■ We agree with the trial court's conclusion that, as a party to the Master Labor Agreement, Hanlin was entitled to notification of the union's intent to renegotiate the collective bargaining agreement at least 60 days prior to its termination under the contract language quoted previously. Although neither the collective bargaining agreement nor the memorandum agreement required the union to designate the date negotiations would commence, the obligation imposed on the union to give notice of its intent to renegotiate the agreement would alert the employer that commencement was imminent, and thus that the employer must decide whether to remain with the multi-employer bargaining unit. This interpretation is supported by the union business manager's testimony that the union's ordinary practice was to send individual notice to independent contractors such as Hanlin.

■ The trial court also found, based on conflicting testimony, that Hanlin did not receive notice of the union's intent to renegotiate the collective bargaining agreement. That finding is binding on this court absent clear error and a review of the record reveals none. *United Bank v. Mesa N.O. Nelson Co.*, 121 Ariz. 438, 590 P.2d 1384 (1979); *Walls v. Stewart Building & Roofing Supply, Inc.*, 23 Ariz.App. 123, 531 P.2d 168 (1975). We turn next to the effect of this lack of notice under federal labor law.

At one time membership in a multi-employer bargaining unit was completely voluntary and any party could withdraw from the unit at any time. Beginning with the National Labor Relations Board's decision in *Retail Associates Inc.*, 120 N.L.R.B. 388 (1958), however, the Board and courts have placed increasing emphasis on the stability of the unit. Withdrawal from the unit is still freely permitted up until the date scheduled for or the actual commencement of negotiations, but once negotiations are underway, one party may withdraw only with the consent of the other or in unusual circumstances.

The parameters of the unusual circumstances exception have not yet been precisely drawn. Courts have recognized unusual circumstances as existing in at least three separate instances: where the employer will suffer extreme financial hardship if not permitted to withdraw, *Charles D. Bonanno Linen Service v. N.L.R.B.*, 454 U.S. 404, 102 S.Ct. 720, 70 L.Ed.2d 656 (1982); where the bargaining unit has been fragmented, *Id.;* and where the bargaining agent refuses to fairly represent the individual employer's interests. *N.L.R.B. v. Siebler Heating & Air Conditioning, Inc.*, 563 F.2d 366 (8th Cir.1977); *cert. denied*, 437 U.S. 911, 98 S.Ct. 3104, 57 L.Ed.2d 1142 (1978).

Courts have also refused to recognize unusual circumstances as existing in several situations. In *Bonanno,* the Supreme Court upheld the Board's position that a bargaining impasse alone did not constitute an unusual circumstance justifying employer withdrawal, thereby rejecting the view shared by several circuits, including the Ninth, that impasse was an unusual circumstance. In addition, several circuit courts of appeal have considered in dicta the possibility that other circumstances might qualify as "unusual," without so holding. *See, e.g., H & D, Inc. v. N.L.R.B.,* 670 F.2d 120 (9th Cir.1982) (mass resignation by H & D's employees from union not unusual circumstances, but resignation by majority of employees represented in entire bargaining unit might be); *N.L.R.B. v. Spun-Jee,* 385 F.2d 379 (2nd Cir.1967) (remanded for Board's consideration whether employer's legitimate business reasons for closing and moving plant during negotiations justified withdrawal); *O'Hare v. General Marine Transport Corp.,* 740 F.2d 160 (2nd Cir.1984) *cert. denied* — U.S. ——, 105 S.Ct. 1181, 84 L.Ed.2d 329 (1985) (invalid provision in collective bargaining agreement might be unusual circumstance, but only if illegality lies in the very trust provision sued on).

The limitation and regulation of multi-employer bargaining units involves a balancing of conflicting interests. Congress has committed the task of striking that balance to the N.L.R.B., with limited judicial review. *Bonanno.* The focal point of the Supreme Court's analysis in *Bonanno* was its endorsement of the Board's conclusion that permitting employers to withdraw at impasse destroyed the bargaining process. The employer argued that it should be entitled to withdraw upon impasse because the union was permitted at that time to bargain separately with members of the multi-employer group and enter interim agreements. The Board distinguished the two situations explaining that the interim agreements did not destroy the bargaining process because they were only temporary, and both parties agreed to adhere to the collective bargaining agreement ultimately achieved in the unit's negotiations. The employer's withdrawal, on the other hand, was a permanent abandonment of the unit, and consequently of the bargaining process. Both the Supreme Court and the N.L.R.B., therefore, recognize the importance of preserving the bargaining process.

The First Circuit Court of Appeals discussed the policy prohibiting withdrawal once bargaining has commenced in *Carvel Co. v. N.L.R.B.,* 560 F.2d 1030 (1st Cir. 1977) *cert. denied,* 434 U.S. 1065, 98 S.Ct. 1240, 55 L.Ed.2d 766 (1978):

"No more is necessary to operate safely in its [*Retail Associate's* ] domain of operation than advertence to the notice dates in the current bargaining agreement. Freedom of action is uncontrolled so long as it is unequivocal and timely. The *Retail Associates* rule is, nonetheless, an administrative construct intended to serve policy aims, stability in industrial relations and fairness in negotiation. As the cases insist, multi-employer bargaining rests on the reality of the consent of the union and of each employer...." *Id.* at 1035.

Allowing free withdrawal prior to negotiations gives the parties ample opportunity to go their separate ways at a time when that decision will not substantially jeopardize the bargaining process. *N.L.R.B. v. Marine Machine Works,* 635 F.2d 522 (5th Cir.1981). Mere dissatisfaction with the direction or results of bargaining does not justify an untimely withdrawal, nor can an employer go along with the group so long as it is advantageous and then quit if he thinks he can strike a better deal on his own. *N.L.R.B. v. Siebler Heating & Air Conditioning,* 563 F.2d 366 (8th Cir.1977).

■ Based on this review of federal labor policy, we perceive that the goal of fairness in negotiations requires real, unequivocal consent to the particular unit and to the bargaining process; hence until the actual bargaining process begins, this goal is served by permitting withdrawal. Once the parties are committed to the process, preservation and success of that process require stability of the unit; thus, once

bargaining begins the right to withdraw is limited to instances involving consent of the parties or unusual circumstances.

 In not one of the many cases discovered by this court did the employer seeking to withdraw from the multi-employer bargaining unit lack actual knowledge of the ongoing negotiations. In fact, in most instances the employer was actively and intimately involved in the bargaining process. As a party to the Master Labor Agreement Hanlin did not expect the agreement to continue indefinitely, but was to receive notice of the union's intent to reopen negotiations in time to withdraw if he felt the multi-employer bargaining unit no longer best met his needs. Not receiving notice, he sent his untimely notice of withdrawal. There is thus no real consent here to be a part of the process of multi-employer bargaining.

While it makes sense to prohibit withdrawal where an employer has waited, biding his time to see which way the tide of negotiations will turn before deciding to withdraw, this is not the case here. Recognizing the effectiveness of Hanlin's withdrawal, therefore, does not jeopardize fairness of negotiations by giving him an unfair bargaining advantage. Rather, it would be unfair under these circumstances to allow Hanlin to be prejudiced by his tardiness in issuing notice of his intent to withdraw when that tardiness was due to the union's failure to carry out its obligation to notify Hanlin of its desire to renegotiate the agreement.

Furthermore, we see no harm to the bargaining process resulting from this withdrawal. Hanlin did not attempt to leave because he was dissatisfied with the direction the negotiations had taken; he was completely unaware of the positions of either the union or the multi-employer bargaining unit. Nor was his participation in any way integral to the process. Not only did he not participate in the negotiations, the parties who did so apparently did not even notice he was gone until nearly two years later. We conclude that Hanlin's withdrawal was effective because the lack of notice was an unusual circumstance and affirm the trial court's ruling that the trust funds cannot recover any contributions for the period after May 31, 1976, the date the Master Labor Agreement terminated.

The trust funds contend that even if Hanlin owes nothing under the 1976–79 Master Labor Agreement he owes contributions for hours worked during May of 1976 and thus that the trial court erroneously denied that portion of their claim. There is ample, but conflicting evidence in the record concerning whether the employees for whom the trust funds seek contributions were performing work covered by the Master Labor Agreement.[4] In fact, the bulk of the transcript concerns this controversy. The trial court, however, did not make any findings of fact or conclusions of law on the issue, apparently ruling that the trust funds' entire claim was barred by laches. The trust funds argue that laches is inapplicable because they filed their complaint within one and one-half years of discovering the amounts due, well within the time permitted by the statute of limitations under § 301, which is six years. Hanlin did not address this point in his briefs and we are forced to conclude that this portion of the trust funds' claim was improperly barred.

 There are two essential elements to the defense of laches: unreasonable delay and prejudice to the defendant in that he changes position in good faith as a result of that delay. *Tovrea v. Umphress*, 27 Ariz.App. 513, 556 P.2d 814 (1976). Lapse of time alone is not controlling. *Id.* Although the applicability of the laches defense is normally left to the discretion of the trial court, we are unable to discern any prejudice to Hanlin resulting from the delay in seeking the contributions due under the original agreement in view of Hanlin's frank admission that he was bound by

---

**4.** Under the Master Labor Agreement employers were required to contribute a specified amount to each trust fund for every work hour of the types covered by the agreement, regardless of whether the work was performed by union members.

the agreement until its expiration on May 31, 1976. We therefore remand for a resolution of the conflicting evidence on covered work for this time period. If the trial court finds that the employees identified by the trust funds in their exhibit 8 were not performing "covered work" in May 1976, then it should re-enter judgment in favor of Hanlin on the complaint. If, however, it determines that some or all of the work was covered by the Master Labor Agreement, then it must enter judgment for the trust funds in that amount and go on to consider whether either of the sureties, the other defendants, is liable for any amount under its bond.

██ The trust funds argue next that Hanlin is not entitled to a refund of contributions for June through September of 1976. Both parties agree that equitable principles govern whether an employer in a particular situation is entitled to a refund of excess contributions made under a mistake of fact. *Teamsters Local 639 Emp. Health Trust v. Cassidy Trucking, Inc.*, 646 F.2d 865 (4th Cir.1981). We find the trial court's decision that Hanlin is entitled to a refund consistent with equity and affirm judgment in favor of Hanlin on the counterclaim.

██ Finally, the trust funds challenge the trial court's award of attorney's fees under A.R.S. § 12–341.01, arguing that it is inconsistent with federal labor law as discussed in *Waggoner v. Northwest Excavating, Inc.*, 642 F.2d 333 (9th Cir.1981), affirmed on remand, 685 F.2d 1224 (9th Cir. 1982) and *Burke v. French Equipment Rental, Inc.*, 687 F.2d 307 (9th Cir.1982). Hanlin replies that both *Waggoner* and *Burke* are based on *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), and therefore apply only to federal litigation in federal courts. He argues that there is no general prohibition against granting attorney's fees in labor actions, citing several cases. Hanlin concludes by arguing on cross-appeal that the trial

court's refusal to award the full amount of attorney's fees requested was an abuse of its discretion.

We agree with the trust funds that an award of attorney's fees under a state statute is inconsistent with the federal goal of uniformity in labor policy. *Waggoner* involved an action by union trust funds to recover unpaid employer contributions. The trust funds prevailed and sought attorney's fees under a state statute similar to A.R.S. § 12–341.01 which permitted the award of fees in actions arising out of contract. The district court denied the request, citing *Alyeska Pipelines*. The trust funds appealed, arguing that the award of fees was permitted under *Textile Workers' Union v. Lincoln Mills*, 353 U.S. 448, 457, 77 S.Ct. 912, 918, 1 L.Ed.2d 972 (1957), which, as previously discussed, allows federal courts to apply state laws compatible with § 301 in order to best effecuate federal policy. The Ninth Circuit held that *Alyeska* imposed strict limits on federal courts, but also concluded that federal labor policy supported denial of an award of fees in any case. The court explained that litigation under § 301 must always be approached in light of the policy of uniformity embodied by that statute, pointing out that the policy would be defeated with few benefits if different state laws were applied.[5] We are persuaded by this reasoning and reverse the trial court's award of attorney's fees. The cases cited by Hanlin are all distinguishable. *Hall v. Cole*, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973) dealt with an award of fees under the common benefit exception to the American rule which generally prohibits the award of fees, rather than with the application of a state statute. In *Seymour v. Hull & Moreland Engineering*, 605 F.2d 1105 (9th Cir.1979) the collective bargaining agreement specifically provided for the award of attorney's fees. Finally, *Summit Valley Industries, Inc. v. Local 112, Carpenters*, 456 U.S. 717, 102 S.Ct. 2112, 72 L.Ed.2d 511 (1982) dealt with whether attorney's fees

---

5. *Waggoner* was remanded to the Ninth Circuit for reconsideration of an issue which had nothing to do with attorney's fees, and the court affirmed its earlier decision.

are recoverable as an element of the damages an employer can recover from the union under § 303(b). The opinion dealt solely with interpretation of the legislative history of § 303 and is inapplicable here.

In summary, we affirm the trial court's holding that because of Hanlin's lack of notice of the union's intent to renegotiate the contract his withdrawal from the multi-employer bargaining unit was not untimely, and that this lack of notice constituted an unusual circumstance. Accordingly, we find Hanlin's withdrawal effective as of the date the Master Labor Agreement terminated, May 31, 1976. Because Hanlin was bound by the Master Labor Agreement through May, the trial court's failure to resolve the conflicting evidence on whether or not Hanlin owed the trust funds contributions for covered work during that month leaves this court unable to rule on that issue, and we remand for determination of that issue based on the evidence in the record, and a determination of whether the other defendants are liable on their bonds. We find the trial court's determination that Hanlin was entitled to a refund of the contributions made after his obligations under the Master Labor Agreement had terminated equitable and accordingly we affirm its judgment in favor of Hanlin on the counterclaim. We hold, however, that the trial court erred in awarding Hanlin attorney's fees under A.R.S. § 12–341.01 because that is inconsistent with federal labor policy in which uniformity of results under § 301 is of paramount importance. We therefore reverse the award of fees.

MEYERSON, P.J., and GRANT, J., concur.