**GLENROY CONSTRUCTION CO., INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 75–1089.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 12, 1975.

Decided Dec. 18, 1975.

Douglass R. Shortridge, Indianapolis, Ind., for petitioner.

Elliott Moore, Deputy Associate Gen. Counsel, Duane M. McDevitt and Robert A. Giannasi, Attys., N. L. R. B., Washington, D. C., for respondent.

Before PELL and STEVENS, Circuit Judges, and PERRY, Senior District Judge.*

PELL, Circuit Judge.

This is a petition for review and a cross-petition for enforcement of an order of the National Labor Relations Board (Board). In issue are 1) whether the Board can only overturn the decision of an Administrative Law Judge (ALJ) when that decision is clearly erroneous and 2) whether the evidence sufficiently supports the decision of the Board.

On March 14, 1973, William Dean O'Bannon, the charging party, began work for the Glenroy Construction Company on a construction job. O'Bannon worked for the next three days and became Union Steward for the job. On March 19 O'Bannon was laid off. Petitioner alleges that the reason was lack of parts, but O'Bannon testified that reference was made at the time of the lay-off to someone coming to the project from another job. O'Bannon kept the jobsite under surveillance on March 20 and 21. No one was on the job because of rain on the twentieth, but on the twenty-first O'Bannon saw a black ironworker trainee working. O'Bannon complained to the foreman, Alfred Hanks, that a black trainee should not be working while he, a white journeyman, was laid off. O'Bannon then went to the Union Hall and complained to Jack Muir, a Union Business Representative, that he had been improperly laid off. Muir told O'Bannon that he would check into the matter. O'Bannon then filed charges with the Board against the Company. These charges were not received by the Company until the following day. Meanwhile, Muir called Walter Jackson, the job superintendent, and complained about the situation. After some discussion, Jackson agreed to reinstate O'Bannon the next day. Muir told Jackson that he would call O'Bannon about 7:00 P.M. and told Jackson to call him about 7:30. Muir talked to O'Bannon about 7:00, but Jackson never got in touch with O'Bannon although there is testimony that he tried.

On the morning of March 22, Hanks called Muir at the Union Hall and left word to send O'Bannon to the jobsite to go to work. A little later O'Bannon arrived at the Union Hall and complained to Muir about Jackson not having called. Muir told O'Bannon about Hanks' call, but an argument ensued because O'Bannon did not believe Muir was doing his job properly. Muir eventually ordered O'Bannon to leave the Hall under the threat of enforcing a provision of the union's by-laws pertaining to a disorderly person in the Union Hall. O'Bannon heeded the invitation, parting with the observation, "If you want to look nice in Court, buy yourself a new suit because that is where you are going." O'Bannon then drove to a spot near the jobsite and viewed it with binoculars. He did not go to the jobsite or communicate with anyone on it. After O'Bannon left the Hall, Muir called Jackson and complained about Jackson not having called the previous night. Jackson again agreed to put O'Bannon to work. O'Bannon was, apparently, never directly told of this conversation. Muir said he expected to tell O'Bannon of it the next day at the Hall, but O'Bannon did not appear there.

On the evening of the twenty-second, O'Bannon telephoned Hanks to find out if he could go to work. Hanks testified that he could not remember the conver-

* Senior District Judge Joseph Sam Perry of the United States District Court for the Northern District of Illinois is sitting by designation.

sation in detail, but he remembered he was tired and had consumed a few drinks. O'Bannon testified that Hanks told him that he did not want him on the job, in essence, because he was a trouble-maker. When asked to explain, Hanks referred to the charges which O'Bannon had filed. O'Bannon explained that the charges were not against him but rather against the company. O'Bannon then suggested that Hanks call Curt Wooten, a Union Business Agent. Hanks did so but did not call O'Bannon back. After about 30 minutes, O'Bannon called Hanks again. Hanks said that the business agent had told him to run the job as he pleased but told O'Bannon to come to the jobsite in the morning to discuss the problem. According to O'Bannon, he then asked Hanks whether he meant that there was a possibility of returning to work. Hanks told him, "No, I don't want you back on the job."

At the hearing before the ALJ it was stipulated by all parties that O'Bannon's original layoff was non-discriminatory. The ALJ found as an ultimate fact that the Union's efforts to secure O'Bannon's immediate recall had been successful and that this was communicated to O'Bannon. In connection with O'Bannon's driving around the jobsite area and viewing it with binoculars from time to time, the ALJ's decision stated the following:

> "The Respondent's analysis of this particular circumstance is well stated:
>
> > 'Considering the undisputed fact that O'Bannon knew he had a job and that Respondent wanted him to return to work, O'Bannon's response affect [sic] his entire credibility and motivation. Had O'Bannon simply gone to the job site and reported for work as instructed by his Union representative, this would never have been.' "

This incorporated reference and a threshold stereotype footnote—"All credibility resolutions made herein are based on a composite evaluation of the de-meanor of the witnesses and the probabilities of the evidence as a whole"—are the only direct references in the ALJ decision to the credibility or lack thereof of any witnesses.

The ALJ found that Muir informed Jackson that O'Bannon had filed at least some kind of charges with the Board and that after learning this Jackson had still told Muir to send O'Bannon to work. The ALJ then proceeded to discuss O'Bannon's conversations with Hanks on the evening of March 22 before reaching his final conclusion:

> "[T]hrough the Union and by direct communications, the Respondent made adequate efforts to recall or reinstate O'Bannon, and in accordance therewith I find that the General Counsel had failed to establish by a preponderance of the evidence that the Respondent violated the Act."

The Board overruled the ALJ, focused almost exclusively on telephone conversations between Hanks and O'Bannon, and found that Hanks fired him because he filed charges with the Board. The Board therefore held that the Company violated §§ 8(a)(1), (3), (4) of the National Labor Relations Act.[1] This petition followed. Before considering the issues, we are constrained to remark that the record as a whole demonstrates rather a clear lack of charismatic characteristics on O'Bannon's part throughout all pertinent episodes. Irrespective of the ultimate inheritance accorded to the meek by the Psalmist, we are unaware of any reason that the abrasive personality individual is any the less entitled to the protections afforded by the law.

## I. Standard of Review

The Company analogizes to Fed.R. Civ.P. 52(a) and argues: "The Administrative Law Judge's determination as to the ultimate fact issue should be sustained unless clearly erroneous." The analogy is inapposite. This court's authority to review decisions of the Board

1. 29 U.S.C. § 151 et seq.

is derived from § 10(e) (Board's petition for enforcement) and § 10(f) (company's petition for review). Both sections provide that the decision of the Board on issues of fact shall be conclusive if supported by substantial evidence on the record as a whole. In *Universal Camera v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), the Supreme Court defined the scope of judicial review under the Act. Though noting that the reviewing court should give the examiner's report the probative force it intrinsically commands, *Id.* at 495, 71 S.Ct. 456, it stated: "The responsibility for decision thus placed on the Board is wholly inconsistent with the notion that it has power to reverse an examiner's findings only when they are 'clearly erroneous.'" *Id.* at 492, 71 S.Ct. at 467. For a recent discussion of the standards this court applies in reviewing Board decisions, see *NLRB v. Marland One-Way Clutch Co., Inc.,* 520 F.2d 856 (7th Cir. 1975).

■ If this were an *a priori* matter we might well find elements of persuasion in Glenroy's argument that the analogy of "clearly erroneous" should carry over to the present situation. The resolution of the question, however, has already been made. The change of title from "trial examiner" to "administrative law judge" is not sufficient cause for us to consider the issue as unresolved. Accordingly, we find the position of the company on this issue to be without merit.

## II. The Board's Findings

The Company does not challenge the legal theory of the Board, *viz.,* failure to reinstate because of filing charges with the Board or complaining to the Union violates §§ 8(a)(1), 8(a)(3), and 8(a)(4). *See generally NLRB v. Vacuum Platers, Inc.,* 374 F.2d 866 (7th Cir. 1967). Nor does the Company challenge the conclu-

sion that Hanks was a supervisor within the meaning of the National Labor Relations Act.[2] The Company challenges the Board's conclusion that O'Bannon was not reinstated for discriminatory reasons.

Were we hearing this case *de novo,* we would perhaps agree with the Company and the conclusions of the ALJ on the grounds of fairness, if no others. If O'Bannon had returned to the jobsite on March 22, we might speculate with considerable certitude that he would have been put to work. Similarly, it is probable that he would have been put to work if he had returned to work after the twenty-second. Whether these speculations or probabilities would have actually been the accomplished fact was prevented from ascertainment by the apparent stubbornness of O'Bannon in not going to the jobsite—a stubbornness seemingly actuated by nothing more than some type of pique that the company had not issued him a personal invitation. Nevertheless, we are not trying the case *de novo,* and the Board decision under review fastens on the aspect which we cannot ignore, that the last communication O'Bannon had from the company, one which would be violative of the Act, was that the foreman, a company agent, did not want him back on the job. The Board, as it is entitled to do, drew the inference that the company was in effect telling him he would not be rehired and that this was based upon his having exercised his protected (and significant) right to file a complaint with the labor board.

■ The result of our review might have been different if O'Bannon's version of what Hanks had told him had been discredited by the ALJ. We are not unfamiliar with findings in ALJ decisions specifically discrediting testimony of specified witnesses. We have already pointed out the lack of such here. This

**2.** The company with commendable candor did footnote in its reply brief:

"The Company did contest the allegation that Foreman Hanks is a supervisor and thus an agent of the Company within the meaning of the Act. The Company disa-

grees with the Law Judge's finding but realistically admits that the Judge's finding in this case is supported by the cases interpreting the Act."

We agree with the position at which the company, albeit reluctantly, has arrived.

lack, when taken in conjunction with the absence of any refutation of O'Bannon's testimony, amply supports the Board's finding and relieves the Board of the claim that it ignored or overruled the ALJ's credibility determination. There was no such determination as to the pertinent testimony to ignore or overrule.

With regard to lack of refutation of the testimony of O'Bannon, we note that Hanks was the final witness at the hearing; and at the conclusion of his testimony we find the following on direct examination:

"A. I said, 'Bill'—we was arguing and I said 'Bill, I am tired, I have had a few drinks, why don't you come by the job tomorrow and talk to me rather than argue on the phone.'

Q. All right. Now, Mr. Hanks, at any time during either the first conversation with Mr. O'Bannon that same night, did you in either of those conversations at any time tell Mr. O'Bannon that 'I am firing you from the job'?

A. I don't recall. Like I said, I was tired. People call you at nights at home and I don't like to argue and I told Mr. O'Bannon to come by the job the next day and talk to me. I don't know whether I did or not."

The final cross examination was brief:

"Q. (By Mr. Droker) Is it your testimony that this is all you recall of the conversation?

A. That's right.

Q. You don't recall whether or not you said anything to him to the effect that you wouldn't have him on the job any more?

A. No.

Q. You have no recollection?

A. No."

In our opinion, merely because a witness is not contradicted does not necessarily mean that his testimony is to be credited. Thus, because of O'Bannon's demeanor or because of contradictions in other parts of his testimony, or because of other factors by the aid of which tri-

ers of fact come to the conclusion that a witness lacks verity, the ALJ might have specifically found the O'Bannon version of the conversation with Hanks not worthy of belief. He did not do so and the weak response in Hanks' own testimony may well be the basis for the ALJ not having done so. Finally, while O'Bannon may not have been a practitioner of the Dale Carnegie school, this does not mean he was untruthful.

We therefore are of the opinion that the findings and conclusions drawn by the Board are supported by substantial evidence. Accordingly, the petition for review is denied and the cross-petition for enforcement is granted.

Enforcement granted.