**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**EASTERN SMELTING AND REFINING CORPORATION, Respondent.**

**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**BARNES AND NOBLE BOOKSTORES, INC., Respondent,**

**and**

**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**WONDER MARKETS, INC., Respondent.**

Nos. 78–1453, 78–1452 and 78–1370.

United States Court of Appeals, First Circuit.

Argued March 5, 6, 7 & 8, 1979.

Decided May 14, 1979.

Paul J. Spielberg, Deputy Asst. Gen. Counsel, W. Christian Schumann, Stephen Mayer and Ruah Donnelly Lahey, Attys., Washington, D. C., with whom John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, John G. Elligers, Frederick Havard, Howard E. Perlstein, and Morton Namrow, Attys., Washington, D. C., were on briefs for petitioner.

Harold N. Mack, Boston, Mass., with whom Philip J. Moss, and Morgan, Brown, Kearns & Joy, Boston, Mass., were on brief for respondent in No. 78–1453.

Jeffrey L. Kreisberg, Hauppauge, N. Y., with whom Robert S. Saltzstein, and Mirkin, Barre, Saltzstein & Gordon, P. C., Hauppauge, N. Y., were on brief for respondent in No. 78–1452.

Sidney A. Coven, Boston, Mass., with whom Bruce Oravec, Worchester, Mass., and Lepie & Coven, Boston, Mass., were on brief for respondent in No. 78–1370.

David E. Watson, Boston, Mass., with whom Nutter, McClennen & Fish, Boston, Mass., Gerald E. Rudman, and Rudman, Winchell, Carter & Buckley, Bangor, Maine, were on brief for respondent in No. 78–1422.

Before ALDRICH and CAMPBELL, Circuit Judges, CAFFREY, District Judge.*

Before ALDRICH and CAMPBELL, Circuit Judges, GIGNOUX, District Judge.*

ALDRICH, Senior Circuit Judge.

■ The fact that four cases involving, broadly, a single principle on which this Circuit and the National Labor Relations Board have been in disagreement for over a decade, were heard in a single week, suggests that we should once more consolidate past decisions and set out our views. The issue is the proper analysis in cases challenging the discharge of an employee under sections 8(a)(1) and (3) of the Act. 29 U.S.C. §§ 158(a)(1) and (3) (1976). Because three of these cases raise the question in a variety of illustrative ways, we treat them in this one opinion.[1] First, however, we discuss in broad terms both the law and the Board's approach to the question whether the motive for a discharge was coercive or discriminatory due to anti-union animus, hereinafter described as a bad reason, or was based upon a business judgment, or good reason. The latter term is shorthand for the established principle that an employer legally may discharge for any cause, whatever others may think of its adequacy, so long as his motivation is not interference with rights protected under the National Labor Relations Act. *See, e. g., Liberty Mut. Ins. Co. v. NLRB,* 1 Cir., 1979, 592 F.2d 595, 603; *NLRB v. Rich's of Plymouth, Inc.,* 1 Cir., 1978, 578 F.2d 880, 887 n.9.

■ Historically, the Board is prone to two errors: labelling the good reason "pretextual" without giving it adequate consideration,[2] or contenting itself with finding that the bad reason played a "substantial

* Sitting by designation.

1. The fourth case, *NLRB v. McCain Foods, Inc.,* No. 78–1422, requires no treatment in text. Substantial evidence supports the findings, and the ALJ's well reasoned analysis, adopted by the Board, applies the correct legal principles. Therefore we enforce the Board's order on the basis of its opinion, pursuant to our general discussion herein. We need note further only our rejection of respondent's claim that a more exacting standard than that applicable to discharge cases should be required in failure-to-hire cases. *Cf. NLRB v. New England Tank Ind., Inc.,* 1 Cir., 1962, 302 F.2d 273, *cert. denied,* 371 U.S. 875, 83 S.Ct. 147, 9 L.Ed.2d 114. As a practical matter, the difficulty of proof may vary, *cf. NLRB v. Rich's of Plymouth, Inc.,* 1 Cir., 1978, 578 F.2d 880, 886, but the legal principles must be the same.

2. *E. g., Liberty Mut. Ins. Co. v. NLRB, ante,* at 601; *NLRB v. Rich's of Plymouth, Inc., ante,* at 886 & n.7; *NLRB v. Fibers Int'l Corp.,* 1 Cir., 1971, 439 F.2d 1311, 1313–15; *NLRB v. Billen Shoe Co.,* 1 Cir., 1968, 397 F.2d 801; *cf. Stone & Webster Eng. Corp. v. NLRB,* 1 Cir., 1976, 536 F.2d 461; *NLRB v. Agawam Food Mart, Inc.,* 1 Cir., 1970, 424 F.2d 1045.

part."[3] This approach permitted one Board counsel to introduce his argument with the statement that this "is not a dual motive case," thereby assuming the point. The employer always asserts a good motive and the Board a bad one, and the division is not so simplistic. We envisage a greater number of possibilities.

0. No basis for finding a bad reason.

1. Bad reason, and "pretextual" good reason.

   (a) Evidence supporting asserted good reason is insubstantial or not credited.

   (b) Alleged good reason was not a motivation at all.

2. Bad reason and good reason.

   (a) Good reason existed, but was insufficient without bad reason.

   (b) Good reason would, of itself, have produced the action.

In types 0 and 2(b) the finding must be for the employer.

■ Admittedly, it is not always easy to determine in which category a particular case falls.[4] The first difficulty may be in deciding whether a bad reason existed at all, one step being whether the company had the requisite knowledge of union activity. *See, e. g., NLRB v. South Shore Hospital*, 1 Cir., 1978, 571 F.2d 677, 683–84. Once that knowledge is established, the bad reason may be shown by independent evidence, or by the circumstances of the discharge itself. On rare occasions an employer may even admit to unlawful motivation, *see* n. 12, post, but the usual case of independent proof is by showing other acts apart from the discharge that indicate unlawful antiunion animus. *E. g., Barnes & Noble Bookstores, Inc.,* post; *Wonder Markets, Inc.,* post. Suspicions arising from the fact that a union supporter was fired in itself are not enough. Nor is employer gratification arising from realization that its action will harm the union. Dislike of unions is not uncommon among employers, and not only do principles of free speech permit it to be voiced, but so does section 8(c) of the Act.[5] To use protected expression to build a case would seem to make the Act a trap. Nonetheless, the Board does so,[6] a practice recently condemned in *Florida Steel Corp. v. NLRB,* 5 Cir., 1979, 587 F.2d 735. Rather, the employer must have exhibited opposition not merely to the union, but to lawful activity by its employees in pursuit of their objectives. We note, moreover, that other labor law violations do not " 'automatically make a discharge an unlawful one.' " *NLRB v. Prince Macaroni Mfg. Co.,* 1 Cir., 1964, 329 F.2d 803, 806, a case often cited by the Board, but not for this caveat.[7] The circumstances must be viewed as a whole.

■ The difficulties intensify when the Board has no independent evidence, and must find improper motivation in the circumstances of the discharge itself. This requires affirmative showing. Hiring and firing decisions are made routinely, and are not inherently improper even though they may occur at a time embarrassing to the union. If an employer asserts an obviously weak or implausible good reason, or one

---

3. *E. g., Coletti's Furniture, Inc. v. NLRB,* 1 Cir., 1977, 550 F.2d 1292; *cf. Hubbard Regional Hospital v. NLRB,* 1 Cir., 1978, 579 F.2d 1251, 1254–56; *NLRB v. Lowell Sun Pub. Co.,* 1 Cir., 1963, 320 F.2d 835.

4. Conversely, we recognize, and warn, that formulism itself presents a danger, and cannot be a substitute for hard analysis.

5. "The expressing of any views, argument, or opinion . . . shall not constitute or be evidence of an unfair labor practice . . . if such expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c) (1976).

6. *See, e. g., NLRB v. Lowell Sun Pub. Co.,* 1 Cir., 1963, 320 F.2d 835, 840; *NLRB v. New England Tank Ind., Inc.,* 1 Cir., 1962, 302 F.2d 273, 276 & n.4, *cert. denied,* 371 U.S. 875, 83 S.Ct. 147, 9 L.Ed.2d 114; *Indiana Metal Prod. Corp. v. NLRB,* 7 Cir., 1953, 202 F.2d 613, 617; *Pittsburgh S.S. Co. v. NLRB,* 6 Cir., 1950, 180 F.2d 731, 735–36, *aff'd,* 340 U.S. 498, 71 S.Ct. 453, 95 L.Ed. 479; *cf. Wal-Lite Div. of U.S. Gypsum Co. v. NLRB,* 8 Cir., 1973, 484 F.2d 108, 112.

7. Over the years we have observed that our decisions restricting the Board are rarely cited by it, no matter how pertinent, a seeming symbolic bookburning difficult to ascribe to oversight.

manifestly unequally applied, this may support an inference that there was a bad reason. But where the burden is on the Board, except in such clear cases the mere fact that the Board considers the asserted good reason less than compelling will not suffice, as is illustrated by *Eastern Smelting & Refining Corp.*, post. As we have frequently said, the Board may not set up its own business standards and then condemn the employer for not following them. *NLRB v. Wells Fargo Armored Service Corp.*, 597 F.2d 7, at 11, 1 Cir., 1979. Unfortunately, however, the Board all too often has either disregarded altogether the valid reasons for the employers' conduct,[8] or has labeled the good reason pretextual, although it was apparent that it was a good reason of substance.[9] In one of the cases at bar the Board has reached the ultimate: the employer is criticized for making a judgmental decision which in a case we heard the month before the employer was criticized for not making. *See* n.21, post. It is difficult to accept such an approach as "expertise."

■ Even if the Board can meet its burden of demonstrating improper motivation, the matter does not end there. The employer may still defend by proving that there was a good reason for the discharge and that "it would have reached the same decision . . . even in the absence of the protected conduct." *Mt. Healthy City Board of Educ. v. Doyle*, 1977, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471. The Board has never mentioned *Mt. Healthy*, let alone explained why it should be thought less serious to violate the First Amendment than the Labor Act.[10] We have put the *Mt. Healthy* principle in the past in terms that, if the employer has established a good reason, it is not to be charged unless its action would not have been taken "but for" the improper motivation,[11] words now to be found in the penultimate paragraph of the Court's recent opinion, following *Mt. Healthy*, in *Givhan v. Western Line Consol. School Dist.*, —— U.S. ——, 99 S.Ct. 693, 58 L.Ed.2d 619 (79). *Givhan* held the employer entitled to this defense even though its improper motivation was the "primary" one—an admitted reliance upon conduct which the Court found was constitutionally protected. However, using the *Mt. Healthy* and *Givhan* test, once the Board has shown a "significant" improper motivation, the burden is on the employer to prove that it had a good reason, sufficient in itself, to produce the discharge. *Id.*, 429 U.S. at 287, 97 S.Ct. 568.[12]

The Board's persistent disregard of the principles governing mixed motive cases ultimately led to our announcing that we would no longer "rescue [it] if it does not both articulate and apply our rule." *Coletti's Furniture, Inc. v. NLRB,* 1 Cir., 1977, 550 F.2d 1292, 1293. Even this has not been fully effective.[13] Instead, as the instant

---

8. *E. g., Raytheon Co. v. NLRB*, 1 Cir., 1964, 326 F.2d 471; *NLRB v. Prince Macaroni Mfg. Co.*, ante; *Stone & Webster Eng. Corp. v. NLRB*, 1 Cir., 1976, 536 F.2d 461.

9. *E. g., Liberty Mut. Ins. Co. v. NLRB*, ante; *NLRB v. Fibers Int'l Corp.*, 1 Cir., 1971, 439 F.2d 1311; *NLRB v. Billen Shoe Co.*, 1 Cir., 1968, 397 F.2d 801.

10. *Mt. Healthy* and *Givhan v. Western Line Consol. School Dist.*, —— U.S. ——, 99 S.Ct. 693, 58 L.Ed.2d 619 (79), are not labor cases, but involved the discharge of teachers by school boards assertedly because they had engaged in constitutionally protected speech. As we pointed out in *Coletti's Furniture, Inc. v. NLRB*, 1 Cir., 1977, 550 F.2d 1292, 1293, the principle is the same. *See, also Waterbury Community Antenna, Inc. v. NLRB*, 2 Cir., 1978, 587 F.2d 90, 99.

11. *E. g., Liberty Mut. Ins. Co. v. NLRB*, ante, at 602–603; *Hubbard Regional Hospital v. NLRB*, 1 Cir., 1978, 579 F.2d 1251, 1255; *NLRB v. Rich's of Plymouth, Inc.*, ante, 887–88; *Coletti's Furniture, Inc. v. NLRB*, ante, at 1293.

12. Even here, however, we caution that the Board may not simply substitute its judgment for that of the employer, and may not reject the employer's proof, absent a reasonable basis. *Compare Eastern Smelting & Refining Corp.*, post, *with Barnes & Noble Bookstores, Inc.*, post; *see, also Wonder Markets, Inc.*, post.

13. *Cf. Liberty Mut. Ins. Co. v. NLRB*, ante, *Barnes & Noble Bookstores, Inc.*, post; *but cf. NLRB v. Jack August Enterprises, Inc.*, 1 Cir., 1978, 583 F.2d 575; *McCain Foods, Inc.*, note 1, ante.

cases illustrate, the correctness of the approach seems to depend upon the choice of Administrative Law Judge. Nonetheless, the Board's decision may be correct for the wrong reason, and in that spirit, if need be, we turn to the cases at hand. Short of this, however, we will adhere to our promise.

## Eastern Smelting & Refining Corp.

■ Before reaching the bad reason discharge issue in this case, we dispose of a section 8(a)(1) charge based upon allegedly threatening statements made to employees during the early stages of an organizational drive. On October 21, 1977 one Berg, a recently hired employee who had already compiled an admittedly bad record for absenteeism, distributed authorization cards obtained from a union organizer the previous day. The company learned promptly that cards were circulating, and that afternoon its manager, Wandry, began interviewing employees individually. There was conflicting testimony as to what was said. According to respondent's evidence, Wandry essentially followed a prepared written script, telling the employees that there had been a strike 14 years before with unfortunate consequences for both sides, and that "as a result of the strike, a number of people were replaced and they had lost their jobs." The ALJ, accepting the employees' somewhat different version, found, however, that Wandry had said only, in various summary forms, "A strike occurred and employees lost their jobs." He found this coercive, and the Board agreed.

Apart from Berg's later discharge, post, no other allegations against the company have been raised.[14] On December 7, 1977 the union was successful at an election and was certified. Thereafter, up to the date of the hearing several negotiating sessions had taken place, apparently conducted in good faith.

We have no reason to question the ALJ's findings as to what was said. The conclusion that the manager's statement unlaw-

fully coerced the employees is, however, another matter. The Board does not claim that the statement was not an accurate, if somewhat cryptic, account of historical fact. Not only under the First Amendment, but under section 8(c) of the Act, such is normally protected. We can agree with the Board that the recitation of past events, could, under the circumstances, be taken as implying that the events could reoccur. That a union might call a strike, however, is a simple fact of life. So is the possibility that it may be unsuccessful. To state either cannot be condemned by the process of calling it a threat; the employer is not restricted to pleasant facts. If there was an implication in the statement that this company had weathered a strike in the past that, too, was a simple fact.

If the past event had involved a wrongful act, e. g., an unfair labor practice strike and the employees had not been reinstated, recounting it could be understood as a threat that such unlawful conduct might be repeated. Wandry's account had no such connotation; nor did the Board so suggest. Respondent's failure to state the full sequence, viz., that some employees had been replaced and not recalled, and its summary form that they had "lost their jobs" is not significant, cf. NLRB v. Rollins Telecasting, Inc., 2 Cir., 1974, 494 F.2d 80, 82, cert. denied, 419 U.S. 964, 95 S.Ct. 224, 42 L.Ed.2d 178; the test is the "total effect." NLRB v. Four Winds Industries, Inc., 9 Cir., 1976, 530 F.2d 75, 78. Plainly, the present case was not an exaggerated effect, such as we condemned in NLRB v. Sinclair Co., 1 Cir., 1968, 397 F.2d 157, aff'd sub. nom. NLRB v. Gissel Packing Co., 1969, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547. The Board gave no reason why it considered it a threat. We see none. Indeed, absent some special ground for believing it untrue, we consider it extraordinary to forbid a simple prophecy, implied or express, that proper past events may reoccur. Cf. NLRB v. Gissel Packing Co., ante, at 618; NLRB v.

14. An unconnected threatening statement, made to one employee, was held by the ALJ not chargeable as an unfair labor practice be-

cause not pleaded. It is not relied on here by the Board, and we disregard it.

*Rollins Telecasting, Inc.,* ante; *Boaz Spinning Co. v. NLRB,* 6 Cir., 1971, 439 F.2d 876, 879; *P. R. Mallory & Co. v. NLRB,* 7 Cir., 1967, 389 F.2d 704, 707; *Russell-Newman Mfg. Co. v. NLRB,* 5 Cir., 1966, 370 F.2d 980, 982–83.

Taking off from this finding of misconduct,[15] the ALJ found that the company's discharge of Berg on November 21 for continued absenteeism was also improperly motivated. To backtrack briefly, Berg started work in May 1977. On September 9 he was given an oral warning for excessive absences. On September 22, for a further absence, he received a written warning reciting that he had been absent 9 days, and stating that "further absences will result in disciplinary action up to and including dismissal." On October 6 he was again absent, and received another written warning, reminding him of the earlier warning and giving him a 5-day suspension. All of this was prior to any union activity. On November 16, 1977, when Berg again missed work and failed to call in to report his absence, he was indefinitely suspended. Five days later respondent wrote him that, after reviewing his record, it had decided to fire him. The reasons given were excessive absences, all but two of which had fallen on the day after payday, and his frequent failure to notify the company and give reasons for his absence. Adopting the ALJ's findings, the Board rejected this as pretextual.

Although there is no direct evidence, we readily assume that respondent knew that Berg was the employee who had originated the cards. It is also clear that respondent was opposed to unionization. Neither of these factors sustained the Board's burden of proof. There being nothing else, it must look to the circumstances surrounding the discharge itself to satisfy it. The ALJ's approach was to analyze in detail the absentee records of six other employees, concluding that Berg's record "was not appreciably different from other employees who were given suspensions rather than discharges." From this he concluded that Berg's treatment was "significantly disparate and the Company's ascribed reasons for the action are not credited."

We do not question the Board's right to disbelieve witnesses. At the same time, when it draws inferences from admitted facts, it must do so fairly, and with full recognition of the burden of proof. As we have said, it is important in cases involving business judgment that the Board not set up its own standard, and then conclude that, since the employer had another, it was ipso facto suspect. The significant phrase in the foregoing quotations is "was not appreciably different." What is appreciable is in the eye of the beholder. The ALJ ignored the fact that the great majority of Berg's absences, unlike those of the other employees, occurred the day following payday—obviously suggestive of a lack of a bona fide excuse. A matter that he could not ignore, the fact that respondent discharged employee Nelson, whose record was highly similar, the ALJ sought to brush aside by referring to the fact that Berg had been complimented on his work, and had received a raise, and there was no such evidence as to Nelson.[16] While to the ALJ this is supposed to make all the difference, which we think an unwarranted assumption, he ignores his own findings that "[d]espite these reassurances . . . [Berg was told orally in September, that if he] missed any more time the Company would have to give him a warning letter."

The Board has every right to criticize an employer for truly disparate treatment and draw adverse inferences therefrom, but a matter such as absenteeism involving many elements, such as length of service, frequency, the pattern, if any, the likelihood of a valid excuse, and the failure to call in, is a subjective mix. Within reasonable limits the employer must be permitted to run its business without the fear of second guess-

15. If we can be forgiven a poor pun, respondent faced the Berg issue with a strike on it when, in fact, its record was clean.

16. Here, again, is an example of what apparently is expected of an employer, though it is up to the Board to prove a case and not up to the respondent to disprove it.

ing by the Board.[17] To hold otherwise would cause an apprehensive employer to give union activists the benefit of special treatment, an unfairness we commented upon as long ago as *NLRB v. Billen Shoe Co.,* 1 Cir., 1968, 397 F.2d 801, 803. As the Court noted in *Mt. Healthy,* ante, at 286–87, the exercise of rights must not spill over to effect an advantage elsewhere. *See Liberty Mut. Ins. Co. v. NLRB,* ante, at 602.

Very possibly if the burden had been on it as a vulnerable respondent to establish its good faith, we could not say that respondent here had incontrovertibly succeeded. However, it was not vulnerable. The burden was on the Board, and the Board failed to show an impropriety affirmatively warranting a finding of an improper motive. To overrule a business judgment, the Board is in the same position as is a court overruling the Board. It cannot overcome a showing of reasonableness simply by concluding that some other action would seem to it more reasonable. *Cf. Universal Camera Corp. v. NLRB,* 1951, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456. If that were so, every action of an employer involving known union supporters would be at risk.

*Barnes & Noble Bookstores, Inc.*

■ The Board here found that respondent's layoff (in fact a discharge) during a union campaign, of one Diamond, a clerk in the children's book department of its Boston store, was illegally based on Diamond's pro-union activities. Asserted good reasons for the discharge—overstaffing in the children's department, and Diamond's overqualification for the job by virtue of his recently completed legal education—were rejected by the Board as pretextual. Unhappily, again the Board misstated the applicable legal principles.[18] Happily for the Board,

however, this is a case where substantial evidence supports the Board's conclusion that the proffered good reasons were truly pretextual. Therefore we affirm.

The record bears out the preliminary findings that respondent, through its president, Riggio, and its Boston general manager, Oviatt, knew of Diamond's union activities, and that its actions independent of the discharge reflected unlawful anti-union animus.[19] Turning to the discharge itself, it appears that Diamond, having disclosed his law degree on his employment application, began work as a clerk in October, 1976, and up to his discharge in April, 1977 performed satisfactorily. Not until union activities began in February, 1977, of which Diamond was an active and vocal supporter, did respondent begin to take an interest in his educational background. In April, after the union had demanded recognition, Oviatt met with Riggio in New York to discuss the Boston operations. Upon reviewing the Boston store's several departments, Diamond's law degree, and the union campaign, Riggio singled out the children's book department as being overstaffed and ordered Diamond discharged. He was discharged on April 29. In rejecting respondent's asserted economic reason, the Board relied on the uncontested facts that, three days prior to the discharge, respondent had hired another clerk; that clerks were frequently transferred to other positions in the store, and that, due to the high turnover in the Boston store, during the following year some 50 new clerks were hired. The conclusion is inescapable that respondent, quite apart from the Board's having met its initial burden of showing bad motivation, failed to show any good reason for Diamond's firing. Rather, the absence of fac-

17. Particularly, second guessing by every ALJ, whose resolution, under announced Board principles, including the instant case, will not be overruled unless "the clear preponderance of all the relevant evidence convinces us. . . ."

18. It is altogether inexplicable that at this late date, June, 1978, an ALJ could say,

"The existence of justifiable grounds for the layoff is no defense if the motivation for the layoff was in part because of the employee's participation in union activities." Equally inexplicable is the Board's silent adoption.

19. In addition to the improper promise of insurance benefits, post, respondent had committed various other unfair labor practices while opposing a union drive in its New York stores.

tual support for respondent's asserted reason permitted an inference of improper motivation. The asserted overstaffing was contradicted by respondent's own hiring practices. In addition, the Board could well find that respondent's new-found objection to overeducation was limited to skills in labor law—in which Diamond appeared to have had some instruction—and improper on its face. This is a perhaps exceptional case where, it being an auspicious time to fire a union activist, the respondent helped to prove the Board's case by advancing manifestly pretextual reasons.

There is a further issue in this case, a section 8(a)(1) charge based on respondent's granting benefits—insurance—to part-time employees during the organization campaign. Respondent counters that its Boston branch is but one of 24 stores of a New York based company, and that it would be absurd to find this was done, companywide, in order to affect an election in a single store. The Board replies that respondent may have already determined, for a proper cause, to grant such benefits generally, but adjusted its timing to meet its Boston problem. To this respondent made no answer, leaving a singular absence of records on an issue affecting 24 stores. There being no established practice to point to, the Board was warranted in concluding that respondent had failed to meet its burden applicable in section 8(a)(1) cases, of showing that the added benefits were granted in the ordinary course. *NLRB v. Rich's of Plymouth,* ante, at 883–84; *NLRB v. Styletek, Div. of Pandel-Bradford, Inc.,* 1 Cir., 1975, 520 F.2d 275, 280–82.

*Wonder Markets, Inc.*

This case started out conventionally, but developed in an unusual fashion. Respondent market, during a prolonged organizational campaign, discharged a meat cutter, Whitney. General Counsel asserted it was because of anti-union animus; respondent claimed that declining business required eliminating a meat cutter—a highly paid position—and that Whitney had the least seniority. The ALJ warrantably found conduct independent of the discharge itself demonstrating unlawful anti-union animus, namely, unlawful threats seeking to dissuade Whitney from advocating the union, adding, "I further find that such warnings evidence the reason for Whitney's [discharge]." This properly put the burden on the respondent of showing good cause for the discharge. It so proceeded, but the ALJ analyzed respondent's admittedly fluctuating and allegedly declining sales and concluded that they did not conform to respondent's negative interpretation, and that there was no need of reducing staff.

In first finding independent evidence of bad motive, then analyzing and rejecting on the merits respondent's asserted good reason and drawing certain inferences therefrom, the ALJ followed exactly the right course. Since he neither cited any of our cases, nor stated that his procedure was obligatory, we do not know whether he was correct because he so recognized, or simply as a matter of good judgment. In any event, his approach went to naught when the case came before the Board and it agreed with respondent that the ALJ's analysis of its sales data had been faulty. Instead of then making its own analysis and determining whether there was an independent good reason for the discharge, the Board stated that the ALJ's error was irrelevant because his finding that the discharge was improperly motivated was correct, viz., was all that needed to be done.[20] That this conspicuously ignored the *Mt. Healthy* rule is shown by the fact that respondent continued thereafter with the reduced number of meat cutters, as the Board recognized in stating, in its order granting relief, that the position was still open.

Since the evidence would at least have warranted a finding that respondent had a valid reason for reducing the number of

---

**20.** "[T]his error does not affect the validity of the Administrative Law Judge's conclusion that Whitney was laid off because of his union activity and not for economic reasons." 236 N.L.R.B. No. 81, n.1.

cutters, we would invoke our announced intent not to rescue the Board from its continued failure to apply correct principles, and would deny enforcement of its order, were it not for a special circumstance. Some months after the discharge, respondent learned, assertedly, for the first time, that because of an erroneous entry on the card of meat cutter Robinson, he, rather than Whitney, had the lesser seniority, and should have been the one discharged. The ALJ found that "[t]he authenticity of that card is questionable, as [the erroneous] date was obviously inserted after the [correct] date . . . for seniority purposes . . . ." We have inspected the original card. A reddish tinge to the ink makes clear that the typing of the erroneous date occurred at a different time from the rest. If one looks back to the only place which respondent, and the evidence, suggests could be its source, the entry is manifestly incorrect. The card was singular on its face and a cursory check at the time of Whitney's selection for discharge—assuming that the incorrect entry itself was not deliberately made at that time—would have revealed the mistake. Whitney should never have been discharged.

The ALJ with some justification questioned respondent's good faith, even though he relied in part on factors we consider erroneous.[21] But, giving respondent the benefit of the doubt and without suggesting that in every case there is a requirement of due care, cf. *Raytheon Co. v. NLRB,* 1 Cir., 1964, 326 F.2d 471, we do hold that when an employer has been shown, independently, to have had a bad motive, as was the case here, and thus has the burden of showing a good cause for the discharge, negligent reliance should be insufficient. Whatever respondent's good faith, its reliance on the card was clearly negligent.

We need spend no words on respondent's attack on the Board's finding that in subsequently offering Whitney a position as a manager trainee it failed to meet its obligation to offer an equivalent position. For a number of reasons Whitney could properly be unwilling to assume the additional duties. Respondent's further challenge to the computation of back pay need not be reached, as it has not been presented to the Board. 29 U.S.C. § 160(e) (1976); *Cf. NLRB v. Seven-Up Bottling Co.,* 1953, 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377; *NLRB v. Otis Hospital,* 1 Cir., 1976, 545 F.2d 252, 257.

*The Board's petition in No. 78–1453 is denied. In No. 78–1452 and No. 78–1370, as well as No. 78–1422, the orders will be enforced.*

---

**21.** The ALJ's complaint that respondent used seniority as the basis for selecting the cutter to be discharged (thereby removing Whitney)—without suggesting what other basis would have been preferable—is an example of damned-if-you-do and damned-if-you-don't. One can readily imagine what would have been said if respondent had removed Whitney by going against seniority. We mention this because it is a method of meeting its burden of proof that too often appeals: once it is concluded that an employer is opposed to unions, everything fits. That this is not idle speculation on our part, see *NLRB v. Wells Fargo Armored Service Corp.,* ante, where the Board held against an employer whose only offense was *not* respecting seniority in recalling economic strikers.