CHICAGO MAGNESIUM CASTINGS COMPANY, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 79–1284.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 26, 1979.

Decided Jan. 7, 1980.

David N. Barkhausen, Chicago, Ill., for petitioner.

J. Keith Gorham, N.L.R.B., Washington, D. C., for respondent.

Before SWYGERT, CUMMINGS and BAUER, Circuit Judges.

CUMMINGS, Circuit Judge.

Chicago Magnesium Castings Company has petitioned us to set aside an order of the National Labor Relations Board, while the Board has filed a cross-application for enforcement of its order requiring the Company to bargain in good faith with the Union,[1] to reinstate employee David Session with back pay, and to post a prescribed notice.

The Company manufactures magnesium and aluminum casting in Blue Island, Illinois, employing during the times relevant here from 35 to 40 employees. In 1970, the Union's Local 233 became the collective bargaining representative of the Company's production and maintenance employees. About July 1, 1973, the Company became a member of the Chicago Foundrymen's Association (the Association), which negotiates collective bargaining agreements for member companies and settles grievances between those companies and the Union. Shortly thereafter, the Company became a party to the Association's agreement with the Union. The Association and the Union negotiated a new contract in June 1976 to extend to April 30, 1979.[2]

---

1. The International Molders and Allied Workers Union. The order required the Company to bargain with that Union by honoring the terms of the Union's agreement with the Chicago Foundrymen's Association, which the Company had joined in 1973.

2. The 1976 contract provides a two-step grievance procedure. The first step provides that the complaining employee, a member of the Shop Committee, and a Company representative shall discuss the complaint. If they fail to settle the matter, the second step provides for written submission of the complaint to the Union, which in turn is to forward it to a griev-

The record in this case centers on the activities of David Session, a journeyman employee[3] of the Company who also served as Union Shop Chairman. Apparently an energetic chairman, Session was particularly active in Union-Company relations during the fall of 1976. In September of that year, several employees of the Company complained to Session that they were not being paid the contractual wage rates. Session immediately initiated discussions with the Company about the matter and when a September 16, 1976, meeting between Session, Union Representative Ware and Plant Manager Larson failed to resolve the complaints, Session filed two Step 2 grievances with the Union. He filed a third grievance on behalf of another employee shortly thereafter. Further, when the Association's Grievance Committee and the Union failed to reach agreement on these grievances at an October 18, 1970, meeting, Session, with Ware's approval, polled the employees of the Company to determine whether they would be willing to strike over the wage issue.[4]

Since the grievances remained unsettled, Union Vice President Bonifer told Ware on October 21 to arrange a grievance meeting with the Company for the following day. Upon arriving at the plant on October 22, Bonifer and Ware tried to talk to Session, but Plant Manager Larson balked at the request, stating that the meeting should be held without Session who, he said, was "losing too much work." When Bonifer then refused to attend the meeting, Larson permitted Bonifer and Ware to confer with Session. Subsequently Bonifer and Ware discussed the grievances with Larson, but neither this meeting nor a subsequent meeting on November 3 resulted in a resolution of the complaints. The parties then arranged a new meeting for November 11, the key date for the first unfair labor practice alleged here.

The record indicates that a week or so before this November 11 meeting, employee Tellie Gay approached Company Superintendent Trock to complain about the super-seniority Session had as Shop Chairman, thus placing Session ahead of Gay seniority-wise despite the latter's longer service with the Company. Gay then inquired about a Union election to replace Session as Shop Chairman. Although Trock's direct response to Gay was somewhat ambiguous, the record indicates that Trock was pleased by the idea and that he afterwards reported to Company President Burnett that the employees would try to have a Union Shop Chairman election on November 11, the day of the grievance meeting.[5] On the day of that meeting Burnett granted an employee request to hold the election during working time.

In the meantime, on November 10, Superintendent Trock notified Session that he would be laid off the next day because he would be unable to make enough molds to pour while attending the grievance meeting.[6] The Company had never previously

ance committee composed of four Association and four Union members. If the Step 2 procedure fails to resolve the complaint, the Union may then strike.

3. The Company's employees fall into two classifications, miscellaneous employees and journeymen. Seniority is determined for each group independently of the other.

4. Larson questioned Session on October 19 about the possibility of a strike, but Session gave only a non-committal response. Although Session's poll disclosed insufficient sympathy for a strike, the Union did obtain a strike authorization from the International Union to provide "leverage" in further discussions with the Company and the Association.

5. The Company asserts that the reason November 11 was chosen for the Shop Chairman election was that the employees wanted to take advantage of the presence of a Union representative, who was at the plant to attend the grievance meeting. The implication is that the choice of dates was unrelated to the temporary lay-off that day of Session (discussed further below). It should be noted, however, that the representative advised both the Company and the employees of his inability to monitor the election, but that the election was held in any event.

6. The Company also laid off employee Johnny Walker on November 11 because Walker would not have any molds to pour in Session's absence.

laid Session off for such a reason. At the November 11 grievance meeting, the Union and the Association reached a wage rate agreement for certain job categories and awarded Session two hours' pay for being laid off that day. Session's third grievance was also discussed but was not resolved. After the meeting, certain Company employees contacted one of the attending Union representatives to inform him of the upcoming Shop Chairman election, but no one informed Session of that election. The Administrative Law Judge hearing this case found, moreover, that the Company made an effort to contact employees other than Session regarding the election, and he discounted the testimony of Company witnesses that the Company thought Session knew of the election and that it tried in any event to reach him after he left the plant. Despite warnings by the Union representative that the proposed election suffered from procedural defects, the employees went ahead with their plans, taking advantage of the Company's decision to allow the election during working time. Session learned of the election, which resulted in a one-vote victory for Gay, only when he returned to work the following Monday.

Session immediately filed the first unfair labor practice charge at issue here, protesting the Company's conduct with regard to the election. The Union, meanwhile, voided the result of the election because of the procedural defects earlier noted by the Union representative. Consequently the Union continued to recognize Session as the Shop Chairman, and Session thereafter resumed his active role as Shop Chairman, filing three more grievances in November. On December 21, Company President Burnett sent Session a letter regarding the election, stating that the Company would not interfere in future intra-union affairs and that it would continue to recognize Session as Shop Chairman.

In the interim, on December 14, Superintendent Trock transferred Session to Gay's job in the core room, setting in motion the events leading to the second alleged violation of the Act. On the day after this transfer, Session complained unsuccessfully to Trock that an overhead crane in the core room was unsafe because it lacked a safety catch. Session also filed two grievances and an unfair labor practice charge [7] when on December 16 and 17 he was again laid off allegedly because of a shortage of work. Session returned to the core room on Monday, December 20. The next day Trock informed Session that he was not meeting production standards for the core room and when Session professed ignorance of the standards. Trock stated that core-room employee Bracey would show him the pertinent standards book. The ALJ found that Session was not aware of any production standards for the core room and had never been informed previously of the existence of the book.[8] It is moreover uncontested that Session had not worked in the core room since 1970 and that Bracey dismissed Session's inquiry about the standards by telling Session that without more experience he could not possibly meet them. Finally, on December 22, Superintendent Trock advised Session that he was being laid off for failing to meet core production standards and that Gay would replace Session on January 3. This layoff and the Company's later refusal to recall Session are the basis of the Section 8(a)(3) charge.

Undaunted by the layoff, Session protested the December 22 action by filing a grievance on December 24. On February 9, 1977, a formal Step 2 committee dismissed the grievance on the basis of Session's failure to meet production standards and in spite of Union Vice President Bonifer's statement that no such standards appeared in the Union-Association bargaining agreement. At that meeting Bonifer reminded

---

7. This unfair labor practice charge is not at issue here.

8. There was conflicting testimony about when Trock first advised Session of the existence of the production standards. Trock testified that

he did so on the first morning Session was assigned to the core room; Session said he learned of the standards only on his third day. The ALJ specifically credited Session's account of the matter.

the Association that the Union had obtained a strike "sanction," which it could invoke over the Session grievance.

On February 15, Session filed still another grievance over the Company's failure to recall him to work. The Union and the Association met on March 24 to consider this complaint, but at the Association's request the parties agreed to adjourn until April 1. Then on March 31 the Association notified the Union that it had received from the Company and accepted a March 28 letter of resignation from the Association. Since March 31 neither the Company nor the Association has processed any of the Company's employee grievances. The Union's third charge is thus that the Company's refusal to honor the contract constitutes a failure to bargain in good faith in violation of Section 8(a)(5) of the Act.

After a four-day hearing in Chicago, the ALJ found that the Company violated Section 8(a)(1) of the Act (29 U.S.C. § 158(a)(1)) by interfering with and participating in the November 11 election for Shop Chairman. He also found that the Company violated Sections 8(a)(1) and 8(a)(3) of the Act (29 U.S.C. § 158(a)(3)) by laying off employee Session and refusing to reinstate him because of his Union and other protected activities. In addition, the ALJ held that the Company violated Sections 8(a)(1) and 8(a)(5) of the Act (29 U.S.C. § 158(a)(5)) by failing to honor the grievance provisions of the collective bargaining agreement between the Union and the Association.

Except for immaterial modifications in the ALJ's recommended order, the Labor Board affirmed his findings and conclusions. The Board ordered the Company to reinstate Session and make him whole for any loss of earnings as the result of his December 22, 1976, layoff. In addition to posting a specified notice, the Company was ordered to bargain in good faith by honoring the provisions of the Association's collective bargaining agreement with the Union, including the processing of employees' grievances under the contractual grievance

procedures.[9] We deny the petition for review and enforce the Board's order in full.

*Company Interference With Employee Internal Union Affairs*

■ Section 7 of the Act (29 U.S.C. § 157) guarantees employees the right to join a labor organization and to engage in concerted activities for the purpose of collective bargaining. Section 8(a)(1) makes it an unfair labor practice for an employer to interfere with those rights. Here the Board held that the Company interfered in the employees' internal union affairs by its activities in connection with the November 11 election for a Shop Chairman. Upon considering the record as a whole, we find substantial evidence to support this finding of the Board.

■ The ALJ expressly credited the testimony of employees Session, Westwood and Reynolds with respect to the circumstances surrounding the November 11 Shop Chairman election. It is of course well settled that we must ordinarily defer to the findings of the ALJ regarding factual issues, particularly when, as here, the credibility of the witnesses is critical. *National Labor Relations Board v. Gogin*, 575 F.2d 596, 605 (7th Cir. 1978). The Company nevertheless resists application of this rule by arguing that the ALJ's findings were defective because he credited all the employee witnesses and discounted the testimony of all Company witnesses. The ALJ did characterize the two Company witnesses as revealing "a tendency to evade, conceal, or distort events at times in order to place their testimony in the most favorable light possible under the circumstances presented" and did state that "where a conflict occurred I have credited the General Counsel's witnesses" (App. 18–19, n. 6). There is nothing improper in such a determination. Indeed, the ALJ's remarks amount to little more than a statement that he found the employees' account of the relevant events more believable than that proffered by the Company witnesses.

---

9. Parts of the Board's order were directed at the Association, but the Board does not seek enforcement of those parts because it has secured the Association's compliance with them.

There is objective evidence to support the ALJ's characterization of the Company's activities and intent. The Company's decision to lay Session off for the election day and its willingness to have the election during working time were both unprecedented. Notwithstanding the Company's argument that its officers thought Session would learn of the election during his appearance at the plant for the grievance meeting, the record indicates that the Company approved the request for a working-time election and word was passed to the employees only after the grievance meeting was concluded. There was also evidence that Company officials carefully observed Session as he left the plant after the grievance meeting, assisted in passing word of the meeting among the employees at the plant and participated in contacting laid-off or absent employees.[10] Such activities at the least give rise to serious questions about the Company's role, particularly since, as the ALJ rightly noted, Chicago Magnesium could have "no legitimate interest in the outcome of an *internal* local union election" (App. 20). When combined with the ALJ's credibility findings, this evidence is sufficient to support his conclusion that the Company was interfering with Union affairs to ensure rival Gay's election and was thus plainly in violation of Section 8(a)(1) of the Act. *Monks Inn, Inc.*, 232 NLRB 978, 982 (1977); see also *National Labor Relations Board v. Indiana and Michigan Electric Co.*, 599 F.2d 185, 190 (7th Cir. 1979).

*Company's Layoff of Employee Session*

■ It is well established that the prosecution of employee grievances is protected by Section 7 of the Act. *National Labor Relations Board v. Ben Pekin Corporation*, 452 F.2d 205, 206 (7th Cir. 1971). Hence the cases are clear that when union officials pursue such complaints, they are engaged in protected union activity. *Glenroy Construction Co., Inc. v. National Labor Relations Board*, 527 F.2d 465, 468 (7th Cir.

1975). Here Session had filed and processed a number of grievances, filed unfair labor practice charges, and mentioned strike action in support of these complaints. In response, the Company displayed what the ALJ could reasonably have found to be a persistent pattern of harassment and interference. Thus although Session's prosecution of the wage scale dispute was unquestionably proper, the Company laid Session off on the day of the November 11 grievance meeting and encouraged the election of employee Gay to succeed Session as Shop Chairman. Session's filing of additional grievances and an unfair labor practice charge after his November 15 return to molding work was followed by a transfer to the core room where he had not worked in many years, and where he had never performed the work assigned to him upon his transfer. During a December 16–17 layoff he filed an additional unfair labor practice charge and after returning to work on December 20 filed grievances over that layoff and hazardous working conditions. Two days thereafter, he was laid off for failing to meet production standards even though he had not been told what they were or how he had failed to meet them. Prior thereto the Company had never laid Session off for failing to meet the work standards in the molding department where he had previously worked. Finally, the Company refused to recall Session since his December 22 layoff. With this background, the Board was justified in concluding that the Company violated Sections 8(a)(1) and 8(a)(3) of the Act.

The Company contends that it had "lawful reasons" (Reply Br. 4) for Session's layoff and cites several recent decisions from other Circuits to show that a layoff of a complaining employee or shop steward can be lawful. We have stated elsewhere, however, that in this Circuit "the presence of valid grounds for an employee's discharge does not legalize a dismissal which was

---

**10.** Although there was testimony that Trock made the calls at the request of an employee because employees are ordinarily not allowed to leave their stations during working time, the ALJ found that Trock's activity was unique to this occasion and summed up Trock's activity by noting that he "blatantly rounded up eligible employee voters both inside and outside the plant" (App. 19).

nevertheless due to a desire to discourage union activity." *Borek Motor Sales, Inc. v. National Labor Relations Board*, 425 F.2d 677, 680 (1970), certiorari denied, 400 U.S. 823, 91 S.Ct. 45, 27 L.Ed.2d 52; *Satra Belarus, Inc. v. National Labor Relations Board*, 568 F.2d 545, 548 (1978). Consequently, notwithstanding Session's alleged failure to meet the production standards, the Company's obviously tainted motive vitiated any legal grounds it might otherwise have had for Session's dismissal.

The cited cases, meanwhile, not only apply a "but for" standard [11] never endorsed by this Court, but are also clearly distinguishable. In *National Labor Relations Board v. Wilson Freight Co.*, 604 F.2d 712, 722–723, 726–727 (1st Cir. 1979), for example, the discharged employee had engaged in gross misconduct amounting to clear disloyalty and had undertaken complaint activity exceeding his contractual authority as a shop steward. Similarly, in *Stein Seal Co. v. National Labor Relations Board*, 605 F.2d 703, 709 (3d Cir. 1979), the employee's conduct verged on patent insubordination. Finally, in *National Labor Relations Board v. Eastern Smelting & Refining Corp.*, 598 F.2d 666, 673 (1st Cir. 1979), the employee was guilty of excessive unexplained absences unrelated to his union activity and had received repeated warnings about his conduct. The record in that case was also devoid of any independent evidence of the company's anti-union animus.

By comparison, Session displayed neither disloyalty nor insubordination. He performed his Union tasks assiduously, but there is no evidence that he attempted to undermine or embarrass the Company. As for the putative "lawful reasons" surrounding the discharge, there is ample evidence that the Company knew both that Session was not aware of the production standards of the core room and that he could not meet them initially. It also offered him little opportunity to improve his performance after notifying him of his allegedly substand-

ard work. Finally, the other findings of the ALJ suggest anti-Union animus on the part of the Company. Accordingly the cases offered by the Company cannot absolve it from the finding of a Section 8(a)(3) violation.

*Company's Failure to Honor Grievance Provisions Contained in the Association's Collective Bargaining Agreement*

██ Section 8(a)(5) of the Act makes it an unfair labor practice for an employer to refuse to bargain collectively with the representatives of its employees. Section 8(d) of the Act (29 U.S.C. § 158(d)) defines a party's duty to bargain as including the execution and honoring of "a written contract incorporating any agreement reached" and states that the duties of notification set forth in that Section "shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period." Board decisions make clear that these provisions make it illegal for a company to modify unilaterally the mandatory subjects of collective bargaining "contained in" a negotiated collective bargaining agreement. *E. g., C & S Industries, Inc.*, 158 NLRB 454 (1966). It is moreover well settled that grievance machinery is a mandatory subject of collective bargaining. *National Labor Relations Board v. Independent Stave Co.*, 591 F.2d 443, 446 (8th Cir. 1979), certiorari denied, —— U.S. ——, 100 S.Ct. 55, 62 L.Ed.2d 37; see also *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409. It is also clear that the grievance machinery at issue in this case was "contained in" the collective bargaining agreement negotiated by the Association and the Union (Jt. Exh. 2, Sec. 8).

██ Not only has the Board placed restrictions on the ability of a company to withdraw from a multi-employer association (*Retail Assocs., Inc.*, 120 NLRB 388, 393

---

**11.** The "but for" standard means that if an employer has established a good reason for a discharge, the discharge does not violate Section 8(a)(3) unless the employer's action would

not have been taken but for the improper motivation. *National Labor Relations Board v. Eastern Smelting & Refining Corp.*, *infra* at 671.

(1958), approved in *Carvel Co. v. National Labor Relations Board*, 560 F.2d 1030, 1034–1035 (1st Cir. 1977), certiorari denied, 434 U.S. 1065, 98 S.Ct. 1240, 55 L.Ed.2d 766), but it is difficult to understand what impact the Company's attempted withdrawal could have had on its apparent obligations under the then existing collective bargaining agreement. An agreement negotiated by a multi-employer association is binding upon its members. *National Labor Relations Board v. Strong*, 393 U.S. 357, 89 S.Ct. 541, 21 L.Ed.2d 546; *Ringside Liquors, Inc.*, 237 NLRB No. 6 at 13–15 (1978). While a member of the Association, moreover, the Company expressly agreed that "any union contract signed by [the Association's Union Contract Negotiation] Committee for the Association shall be binding for the term of the contract on all Association Members whose names are affixed thereto" (Assoc. By-Laws, Assoc. Exh. 1, Art. IX, Sec. 2(b)). The Company signed the contract negotiated by that committee with the Union. Thus whether or not it chose to remain a member of the Association, the Company was obligated by the terms of the contract. Since that contract contains procedures for processing pending grievances through an Association-Union committee, the Company's refusal to participate in that process constitutes a violation of Section 8(a)(5) under the principles previously noted.

The Company argues, however, that since the Union did not notify it of the grievances at Step 2 of the grievance process, the Company cannot be said to have refused to abide by the contract terms. But neither the collective bargaining agreement nor the previous practice under the contract required the Union to direct its complaints to the Company rather than the Association. The Association has, meanwhile, refused to process any of the grievances forwarded to it by the employees, apparently because of the Company's attempted withdrawal from the Association.[12] This conduct amounts to a refusal by the Company to comply with the contract. Finally, there is no question that in cases in which a company repudiates a contract in this fashion, the Board may seek under the auspices of Section 8(a)(5) an order directing the Company to honor the contract. *National Labor Relations Board v. Hyde*, 339 F.2d 568, 572 (9th Cir. 1964); *Crescent Bed Co.*, 157 NLRB 296, enforced *per curiam*, 63 LRRM 2480 (D.C. Cir. 1966); see also *National Labor Relations Board v. Strong*, 393 U.S. 357, 89 S.Ct. 541, 21 L.Ed.2d 546. The Board's order respecting the grievance provisions of the collective bargaining agreement between the Association and the Union was therefore proper.

The Board's order will be enforced in full.